ORIGINAL

## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO
## CIVIL DIVISION

| | | |
|---|---|---|
| **CORINNE ZACHRY** | : | Case No. A1600762 |
| 1934 Gardena Street | | |
| Glendale, CA 91204 | : | JUDGE |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | |
| **v.** | : | **COMPLAINT** |
| | : | **& JURY DEMAND** |
| **ABUBAKAR ATIQ DURRANI, M.D.** | : | |
| Serve: Orthopedic & Spine Institute | : | |
| 203 Canal Road | : | |
| Lahore 54000 Pakistan | : | |
| (Serve by regular mail) | **REGULAR MAIL WAIVER** | |
| | : | |
| And | : | |
| | : | |
| **CENTER FOR ADVANCED SPINE** | : | |
| **TECHNOLOGIES, INC.** | : | **(ALL NEW DR. DURRANI CASES** |
| Serve: Orthopedic & Spine Institute | : | **SHALL GO TO JUDGE RUEHLMAN** |
| 203 Canal Road | **REGULAR MAIL WAIVER** | **PER HIS ORDER)** |
| Lahore 54000 Pakistan | | |
| (Serve by regular mail) | : | |
| | : | |
| And | : | |
| | : | |
| **WEST CHESTER HOSPITAL, LLC** | : | |
| 7700 UNIVERSITY DRIVE | : | |
| WEST CHESTER, OH 45069 | : | |
| | : | |
| SERVE: GH&R BUSINESS SVCS., INC. | : | |
| 511 WALNUT STREET | : | |
| 1900 FIFTH THIRD CENTER | : | |
| CINCINNATI, OH 45202 | **REGULAR MAIL WAIVER** | |
| (Serve via Certified mail) | : | |
| | : | |
| And | : | |
| | : | |
| **UC HEALTH** | : | |
| SERVE: GH&R BUSINESS SVCS., INC. | : | |
| 511 WALNUT STREET | : | |
| 1900 FIFTH THIRD CENTER | : | |
| CINCINNATI,OH 45202 | : | |
| (Serve via Certified mail) | : | |

FILED
FEB - 8 P 12:40

D113447918 INI

And                                          :
                                             :

**CINCINNATI CHILDREN'S**                    :
**HOSPITAL MEDICAL CENTER**                  :
3333 BURNET AVENUE                           :
CINCINNATI, OH 45229                         :
                                             :
Serve: Frank C. Woodside III                 :
1900 Chemed Center                           :
Cincinnati, OH 45202          **REGULAR MAIL, WAIVER**
(Serve via Certified mail)                   :
                                             :
            **Defendants.**                  :

---

Come now Plaintiffs, Corinne Zachry, and file this Complaint and jury demand and state as follows:

1. At all times relevant, Plaintiffs were residents of and domiciled in the State of Ohio.

2. At all times relevant, Defendant Dr. Abubakar Atiq Durrani (hereinafter "Dr. Durrani") was licensed to and did in fact practice medicine in the State of Ohio.

3. At all times relevant, Center for Advanced Spine Technologies, Inc. (hereinafter "CAST"), was licensed to and did in fact perform medical services in the State of Ohio, and was and is a corporation authorized to transact business in the State of Ohio and Kentucky.

4. At all times relevant, Cincinnati Children's Hospital Medical Center (hereinafter "Children's Hospital"), was authorized to transact business and perform medical services in the State of Ohio and operate under the trade name Children's Hospital Medical Center.

5. At all times relevant herein, Children's Hospital held itself out to the public, and specifically to Plaintiff, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

6. At all times relevant Dr. Durrani was an employee of Children's hospital.

7.    At all times relevant, West Chester Hospital, LLC (hereinafter "West Chester Hospital"), was a limited liability company authorized to transact business and perform medical services in the State of Ohio and operate under the trade name West Chester Hospital.

8.    At all times relevant, Defendant UC Health Inc., was a duly licensed corporation which owned, operated and/or managed multiple hospitals including, but not limited to West Chester Hospital, and which shared certain services, profits, and liabilities of hospitals including West Chester.

9.    At all times relevant herein, West Chester Medical Center, Inc., aka West Chester Hospital held itself out to the public, and specifically to Plaintiffs, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

10.  UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC.

11.  UC Health Stored BMP-2 at UC Health Business Center warehouse located in Hamilton County.

12.  UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC. UC Health is located in Hamilton County making Hamilton County appropriate to bring this lawsuit.

13.  The subject matter of the Complaint arises out of medical treatment by Defendants in Hamilton County, Ohio.

14.  The amount in controversy exceeds the jurisdictional threshold of this Court.

15.  This case has been previously dismissed pursuant to Civ. R. 41(A)(1)(a) and is now being refiled within the time allowed by O.R.C. 2305.19.

## FACTUAL ALLEGATIONS OF PLAINTIFF

16. Plaintiff sought treatment from Children's Hospital, for Kidney stones when she was 14 years old. Children's Hospital performed a CT scan on the Plaintiff.

17. Plaintiff was referred by her primary care physician, to Dr. Durrani, for low back pain. Plaintiff's primary care physician believed Plaintiff's pain was due to the kidney stones.

18. At the office visit, at CCHMC, on November 22, 2005 Dr. Durrani told Plaintiff and her parents that she had a very serious pars defect that required immediate attention.

19. Dr. Durrani also told Plaintiff that if the pars defect was not attended to quickly she would not be able to walk by the age of 30.

20. On January 27, 2006, Dr. Durrani performed a posterior spinal fusion at S1-L5 on Plaintiff at Children's Hospital.

21. Upon information and belief, Dr. Durrani used Infuse/BMP-2 "off-label," without Plaintiff's knowledge or consent, causing Plaintiff harm.

22. The use of BMP-2 increases a person's chance of cancer by 3.5%

23. Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of BMP-2.

24. As a direct and proximate result of the use and implementation of Infuse/BMP-2 Plaintiff has incurred a 3.5% increase in the risk of Cancer. As a result, Plaintiff has an increased fear of Cancer.

25. After surgery, Plaintiff experienced more pain than she had prior to surgery and could no longer bend her back as she could before surgery with Dr. Durrani.

26. Plaintiff continued to see Dr. Durrani for follow up care at Children's Hospital and she also began physical therapy at this time.

27. In the fall of 2011, Plaintiff visited Dr. Durrani at CAST and received steroid injections for her pain, which greatly exacerbated her pain and at this point Plaintiff began experiencing pain in her legs.

28. Dr. Durrani told Plaintiff that she needed another surgery.

29. On August 17, 2012, Dr. Durrani performed a second surgery on Plaintiff at West Chester Hospital. Specifically, he conducted a posterior thoracic spinal fusion.

30. Upon information and belief, Dr. Durrani used Puregen, which is not approved by the FDA, without Plaintiff's knowledge or consent, causing Plaintiff harm.

31. After this second surgery, Plaintiff experienced pain and a great deal of numbness, which Dr. Durrani told Plaintiff this would subside within 4-6 weeks.

32. Plaintiff last treated with Dr. Durrani about a week or two after her surgery.

33. Plaintiff still experiences constant and severe back pain and stiffness as well as leg pain.

34. Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

35. As a direct and proximate result of this surgery and Dr. Durrani's negligence, the Plaintiff has suffered harm.

36. Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 and Puregen until legal counsel informed Plaintiff of Dr. Durrani's propensity to use BMP-2 and Puregen.

## MORE SPECIFIC ALLEGATIONS BASED UPON DISCOVERY AND DEPOSITION TESTIMONY

37. This information is to demonstrate the overall negligence and inappropriate actions of Dr. Durrani and the hospitals he worked with and/or for and/or in an individual capacity.

38.    Krissy Probst was Dr. Durrani's professional and personal assistant handling professional, academic, travel, surgery scheduling, his journals, his Boards, his credentialing, his personal affairs and his bills.

39.    Krissy Probst worked as Dr. Durrani's assistant for three years at Children's Hospital from 2006, 2007, and 2008.

40.    Krissy Probst reported Dr. Durrani to Sandy Singleton, the Business Director at Children's for his having an affair with Jamie Moor, his physician assistant.

41.    Krissy Probst resigned in 2008 from Dr. Durrani and remained working for three other surgeons in the Orthopedic Department.

42.    Krissy Probst worked in the Orthopedic Department for eleven years from 2002-2013. She retired in May, 2013.

43.    Krissy Probst confirmed Dr. Durrani claims being a Prince, when he is not.

44.    According to Krissy Probst, Dr. Crawford, an icon in pediatric orthopedics treated Dr. Durrani "like a son."

45.    According to Krissy Probst, Dr. Crawford, Chief of Orthopedics at Children's unconditionally supported Dr. Durrani no matter the issues and problems Dr. Durrani faced.

46.    Dr. Durrani's patient care at Children's Hospital dropped off considerably after Jamie Moor became his physician assistant and they began their affair.

47.    Dr. Durrani was the only orthopedic spine surgeon at Children's who would perform a dangerous high volume of surgeries.

48.    At Children's, Dr. Durrani would begin a surgery, leave and have fellows and residents complete a surgery or do the full surgery while he was in his office with Jamie Moor, his physician assistant for four or five hours.

49.   Children's Board and administration knew about Dr. Durrani doing too many surgeries and not properly doing the surgeries. They did nothing.

50.   Dr. Durrani argued to Children's administration when they complained to him that he made them money so Children's tolerated him and allowed him to do what he wanted.

51.   Dr. Durrani, when told by Children's that Jamie Moor had to leave, told Children's that he would leave too.

52.   Dr. Agabagi would do one spine patient a day at Children's because it takes normally eight hours for a full fusion.

53.   Dr. Durrani would schedule two to three spine surgeries a day at Children's.

54.   Dr. Durrani would repeatedly have the Business Director, Sandy Singleton, or OR Director allow him to add surgeries claiming they were emergencies when they were not.

55.   Dr. Durrani would leave a spine surgery patient for four or five hours in the surgery suite under the care of fellows or residents, unsupervised and sit in his office and check on the surgery as he pleased.

56.   Dr. Peter Stern did not like Dr. Durrani while Dr. Durrani was at Children's because he knew all about his patient safety risk issues. Yet, Dr. Stern supported, aided and abetted Dr. Durrani's arrival at West Chester. It defies comprehension, but was for one of the world's oldest motives—greed of money.

57.   There is also a Dr. Peter Sturm, an orthopedic at Children's who also had no use for Dr. Durrani.

58.   Dr. Durrani chose his own codes for Children's billing which he manipulated with the full knowledge of Children's Board and management.

59. Dr. Durrani was dating and living with Beth Garrett, a nursing school drop-out, with the full knowledge of his wife Shazia.

60. Dr. Durrani was close with David Rattigan until David Rattigan pursued Jamie Moor and Dr. Durrani would not allow David Rattigan in the OR at Children's for a long time.

61. Dr. Durrani, while claiming to have riches, does not. Dr. Durrani's wife's family paid for Dr. Durrani's education and it is her family with the significant wealth.

62. Medtronics paid for Dr. Durrani's trips and paid him $10,000 fees for speaking or simply showing up at a spine conference.

63. Krissy Probst's business director told her to save all Dr. Durrani related documents and information and she did.

64. While doing research at Children's, Dr. Durrani would misstate facts regarding his research. Children's knew he did this.

65. Dr. Durrani ended on such bad terms with Children's Hospital he was not allowed on the premises after his departure in December 2008, yet he performed a spine surgery there in February 2009.

66. Eric J. Wall, MD was the Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

67. Sandy Singleton, MBA was the Senior Business Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

68. On information and belief, Dr. Durrani used his relationships with Children's officials to purge his Children's file of all patient safety and legal issues which had occurred as part of his departure "deal" which Defendants hide with privilege.

## INFUSE/BMP-2

### I.    BACKGROUND INFORMATION

69.    The Deters Law Firm, P.S.C., represents approximately 500 Plaintiffs in medical malpractice actions against a former Northern Kentucky/Cincinnati-area spine surgeon named Abubakar Atiq Dr. Durrani (Dr. Durrani), his company, Center for Advanced Spine Technologies, Inc. (CAST), and several area hospitals including, but not limited to, West Chester Hospital (WCH), University of Cincinnati Health (UC Health), Cincinnati Children's Hospital Medical Center (CCHMC), Christ Hospital, Deaconess Hospital, Good Samaritan Hospital and Journey Lite of Cincinnati, LLC (Journey Lite) (collectively Hospitals).

70.    Dr. Durrani performed unnecessary, fraudulent, dangerous, and ultimately damaging surgeries on these Plaintiffs while working for and with these Hospitals.

71.    The scheme and artifice to defraud that Dr. Durrani devised, executed, and attempted to execute while working for and with the Hospitals included the following patterns and practices:

> a.    Dr. Durrani persuaded the patient that surgery was the only option, when in fact the patient did not need surgery.
>
> b.    Dr. Durrani told the patient that the medical situation was urgent and required immediate surgery. He also falsely told the patient that he/she was at risk of grave injuries without the surgery.
>
> c.    Dr. Durrani often told his cervical spine patients that they risked paralysis or that his/her head would fall off if he/she was involved in a car accident, ostensibly because there was almost nothing attaching the head to the patient's body.
>
> d.    Dr. Durrani often ordered imaging studies such as x-rays, CT scans, or MRIs for patients but either did not read or ignored the resulting radiology reports.

e.      Dr. Durrani often provided his own exaggerated and dire reading of the patient's imaging study that was either inconsistent with or was plainly contradicted by the radiologist's report. At times, Dr. Durrani provided a false reading of the imaging.

f.      Dr. Durrani often dictated that he had performed certain physical examinations and procedures on patients that he did not actually perform.

g.      Dr. Durrani often ordered a pain injection for a level of the spine that was inconsistent with the pain stated by the patient or with that indicated by the imaging. Dr. Durrani also scheduled patients for surgeries without learning of or waiting for the results of certain pain injections or related therapies.

h.      Dr. Durrani often dictated his operative reports or other patient records months after the actual treatment had occurred.

i.      Dr. Durrani's operative reports and treatment records contained false statements about the patient's diagnosis, the procedure performed, and the instrumentation used in the procedure.

j.      When a patient experienced complications resulting from the surgery, Dr. Durrani at times failed to inform the patient of, or misrepresented the nature of, the complications.

k.      All of the above-mentioned actions were done with the knowledge, cooperation, or intentional ignorance of the Hospitals because Dr. Durrani was one of the biggest moneymakers for the Hospitals.

72.      In addition to the civil medical malpractice actions against Dr. Durrani, on August 7, 2013, he was indicted by the Federal Government for performing unnecessary surgeries and for defrauding the Medicare and Medicaid programs. Specifically, the ten-count complaint charged Dr. Durrani with health care fraud, in violation of 18 U.S.C. § 1347, and making false statements in health care matters, in violation of 18 U.S.C. § 1035. There was a subsequent superseding indictment adding over 30 counts.

73.     Following these criminal indictments, in December of 2013 and prior to the first Plaintiff's trial in these actions, Dr. Durrani fled the United States and returned to Pakistan. He has not returned to the United States to face allegations of either criminal or civil liability.

74.     Among Dr. Durrani's and the Hospitals' professional failings was the use of a synthetic bone-morphogenetic protein called BMP-2, which was marketed under the trade name "Infuse." Dr. Durrani used BMP-2/Infuse in ways that were either not approved by the federal Food and Drug Administration (FDA) or that were specifically contraindicated as noted on the FDA-approved product labeling. The Defendants had full knowledge of this fact.

75.     BMP-2/Infuse was, at the time of the surgeries in question, and currently still is manufactured by a company called Medtronic, Inc. (Medtronic).

76.     Dr. Durrani predominantly used BMP-2/Infuse on patients at WCH, which is owned by UC Health.

77.     It is Plaintiffs' position that this non-FDA-approved use of BMP-2/Infuse was not only negligent, and fraudulent, but criminal based upon the manner in which it was allowed to be used by Dr. Durrani at West Chester, all with the knowledge and full support of the Defendants.

**II.     THE PLAYERS REGARDING BMP-2**

78.     Dr. Durrani is a citizen of the Republic of Pakistan and was a permanent resident of the United States who, from approximately 2005 to 2013, worked as a spine surgeon in and around Cincinnati, Ohio, until he fled the United States to escape civil liability and criminal prosecution.

79.     Medtronic is an Irish corporation, with its principal executive office located in Dublin, Ireland, and its operational headquarters located in Minneapolis, Minnesota. Medtronic is the world's third largest medical device company and manufactures and markets BMP-2/Infuse. Medtronic sales

representatives were also present during the experimental surgeries performed on Plaintiffs, who are clients of the Deters Law Firm.

80. CAST was a corporation organized under the laws of Ohio and had business and medical offices in Florence, Kentucky and Evendale, Ohio. CAST was owned, in whole or in part, by Dr. Durrani.

81. Bahler Medical, Inc. is a manufacturer of medical implants and is a corporation located in the state of Ohio.

82. David Rattigan is an Ohio resident and was and is a sales representative for Medtronic. Further, he is affiliated with Bahler Medical, Inc., was involved in many of the transactions involving BMP-2, and was present for the experimental surgeries in which BMP-2 was used.

83. West Chester Hospital, LLC is a corporation organized under the laws of Ohio. It provides medical facilities and billing support to physicians, including Dr. Durrani, in the state of Ohio. WCH is owned by UC Health.

84. UC Health is a private, non-profit corporation organized under the laws of Ohio. It provides medical facilities, management, administrative, ancillary, and billing support to physicians, and it owns WCH.

85. CCHMC is a medical facility in Ohio where Dr. Durrani was an employee until approximately 2008.

## III.    WHAT IS BMP-2/INFUSE?

86.    The full name of BMP-2 is "Recombinant Human Morphogenetic Protein-2" (also called rhBMP-2). The following definitions apply:

    a.    Recombinant – Artificially created in a lab;

    b.    Morphogenetic – Evolutionary development of an organism;

    c.    Protein – Essential for growth and repair of tissue.

87. Recombinant human protein (rhBMP-2) is currently available for orthopedic usage in the United States.

88. Medtronic manufactured, marketed, sold, and distributed BMP-2 under the trade name "Infuse."

89. BMP-2 has been shown to stimulate the production of bone.

90. Implantation of BMP-2 in a collagen sponge induces new bone formation and can be used for the treatment of bony defects, delayed union, and non-union.

**BMP-2 AS A BIOLOGIC**

91.    BMP-2 is not a device, but instead it is a biologic. *See* July 2009 American Medical Association Article and 2011 Stanford School of Medicine Article.

92.    According to the FDA, "[a] 'biological product' means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings (Public Health               Service               ActSec.351(i)1."Available http://www.fda.gov/ICECI/Inspections/IOM/ucm122535.htm.

93.    BMP-2 is a Bone-Morphogenetic Protein that is used to promote bone creation and remolding and falls under the definition of a biologic. *See* AMA article ("bone forming properties") and Stanford Article. BMP-2 differs from a medical device in that once implanted, it can only be removed days after surgery. If a patient had a complication due to BMP-2 and did not discover this complication until year after surgery, the patient could not have BMP-2 removed to reduce the complication because BMP-2 is so integrated into the patient's bone.

94.     A patient has a right to determine what happens to his or her body and the preservation of that right requires that the patient be informed when a bone growth product, that causes irreversible harm, is placed in his or her body.

**WHEN IS IT USED?**

95.     Recombinant human BMPs are used in orthopedic applications such as spinal fusions, non-unions, and oral surgery.

96.     The bone graft contains two parts. The first is a solution of human bone growth protein or morphogenetic protein-2. This protein is found in the human body in small dosages and is important for the healing and formation of bones. The protein is genetically engineered to be utilized in the Infuse Bone Graft product, and it is employed for the stimulation of formation and growth in bones.

97.     The second part of the bone graft is an absorbable collagen sponge.

98.     Both components of the Infuse Bone Graft structure are used to fill the LT-Cage Lumbar Tapered Fusion Device. This chamber is intended to restore the deteriorated disc space to its original height.

99.     FDA-approved use for the Infuse Bone Graft product is only for lower back surgery using an anterior lumbar interbody fusion (ALIF), a technique where the operation on the spine is conducted through the abdomen.

100.    In addition, the Infuse Bone Graft product must be used in conjunction with Medtronic's LT-Cage. Use of BMP-2 without the LT-Cage is considered an "off-label" use.

**CONTRAINDICATIONS OF USE**

101.    The FDA specifically warns against the use of Infuse in the cervical spine, citing reports of "life-threatening complications."

102. Any use of Infuse other than in lumbar spine surgeries with the LT-Cage is considered "off-label" use

103. Infuse should never be used on the skeletally immature patient, i.e., in patients less than 18 years of age or those with no radiographic evidence of epiphyseal closure.

104. Infuse should never be used in the vicinity of a resected or extant tumor.

105. Infuse should never be used in those patients known to have active infection at the surgical site.

**RISKS ASSOCIATED WITH OFF-LABEL USE**

106. When used in an off-label manner, patients may experience problems with pregnancy, including but not limited to: complications in fetal development; allergic reactions to titanium, bovine type I collagen, or bone morphogenetic protein–2; infection; the creation or intensification of tumors; liver or kidney disease; lupus or human immunodeficiency virus (HIV/AIDS); problems with radiation, chemotherapy, or steroids if a patient is malignant; paralysis; bowel and/or bladder dysfunctions; sexual disorders, including sterilization and incompetence; respiratory failure; excessive bleeding, and; death.

**IV.     THE REGULATORY PROCESS**

107.    The Medical Device Amendments (MDA) to the federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., established two separate approval processes for medical devices: Pre–Market Approval (PMA) and Pre–Market Notification.[1]

108.    The FDA's PMA process is lengthy and involves extensive investigation by the FDA. The PMA application requires manufacturers to submit extensive animal and human data to establish

---

[1] *Fender v. Medtronic*, 887 F.Supp. 1326 fn 1 (E.D. Cal.1995).

their devices' safety and effectiveness. 21 C.F.R. § 814.20. Frequently, an experimental program under close FDA scrutiny must be successfully completed before FDA approval can be obtained under this process. FDA regulations also require PMA applicants to submit copies of all proposed labeling for the device. 21 C.F.R. § 814.20(b)(10). The FDA approves a PMA application only after extensive review by the agency and an advisory committee composed of outside experts. 21 C.F.R. § 814.40.[2]

109.    In contrast, the FDA's Pre–Market Notification process is more abbreviated and involves less FDA oversight. This process requires applicants to submit descriptions of their devices and other information necessary for the agency to determine whether the devices are substantially equivalent. Pre–Market Notification applicants must also submit their proposed labeling. 21 C.F.R. § 807.87. If the FDA determines that a device is substantially equivalent to a device that was on the market prior to the enactment of the MDA in 1976, the applicant is free to market the device.

110.    BMP-2 received PMA (PMA number P000058) for the Infuse/BMP-2 Lumbar Tapered Fusion Device, which PMA provided for limited use with specific requirements for its use on individuals. See Medtronic Package Insert.

**SCOPE OF THE PMA AND PRODUCT LABELING**

111.    The PMA for BMP-2 provided that the product may only be used in patients with the following characteristics:

    d.    Skeletally mature patient, AND

    e.    At levels L2-S1, AND

    f.    Confirmed degenerative disc disease (DDD), AND

---

[2] *Fender v. Medtronic*, 887 F.Supp. 1326 fn 1 (E.D. Cal.1995).

g.     Using only an open anterior or anterior laparoscopic approach, AND[3]

h.     Six months of non-operative treatment prior to treatment with the device, AND

i.     In combination with the metallic LT-CAGE.[4]

See Medtronic Package Insert, "INDICATIONS."

112.     According to Medtronic's package insert for BMP-2/Infuse as well as other industry literature, the following risks are associated with the use of BMP-2/Infuse:

A.     Male Sterility

B.     Cancer

C.     Increased progression of cancer

D.     Suffocation of the cervical region

E.     Bone fracture

F.     Bowel/bladder problems

G.     Loss of spinal mobility or function

H.     Change in mental status

I.     Damage to blood vessels and cardiovascular system compromise

J.     Excessive bone mass blocking the ability to treat pain

K.     Damage to internal organs and connective tissue

L.     Death

M.     Respiratory problems

N.     Disassembly and migration of components

O.     Dural tears

P.     Ectopic and exuberant bone formation

---

[3] The anterior interbody fusion approach was developed because the risk of non-union (pseudarthrosis) is significantly higher in posterior approaches. The biggest risk factor for fusion surgery is non-union.

[4] Instrumented fusions involve hardware and are more stable fusions with a shorter recovery time than non-instrumented fusions.

Q.      Fetal development complications (birth defects)

R.      Foreign body (allergic) reaction

S.      Gastrointestinal complications

T.      Incisional complications

U.      Infection

V.      Insufflation complications

W.      Neurological system compromise

X.      Non-union

Y.      Delayed union

Z.      Mal-union

AA.     Change in curvature of spine

BB.     Retrograde ejaculation

CC.     Scars

DD.     Tissue and nerve damage

EE.     Itching

FF.     Pain

GG.     Hematoma

HH.     Anaphylactic reaction

II.     Elevated erythrocyte sedimentation rate

113.    Injury Percentages:

j.      Ectopic Bone Growth-63%

k.      Inflammatory Neuritis-15%

l.      Osteolysis/Subsidence-13%

m.      Acute Swelling-7%

n.      Retrograde Ejaculation-2%

o. 85% of time, BMP-2 implanted in off-label use

114. Not a single one of these risks in the last two paragraphs were ever explained to a single patient at Children's Hospital by Dr. Durrani.

115. BMP-2 was NOT approved by the FDA for use in the cervical and thoracic spine and BMP-2 was NOT safe or approved for use in children less than 21 years of age. These uses are considered "off-label."

## "OFF-LABEL" USE

116. A use of a device is considered "off-label" if it is not approved under the Pre-Market Approval process OR cleared for such use pursuant to 21 U.S.C. § 360c(f) (also known as "the 510k premarket notification process").

117. Infuse can be implanted in an off-label manner in three ways:

        p.      Approach/position: Any approach other than an anterior approach;

        q.      Product: Failure to use LT-Cage (or any cage); mixing rhBMP-2 with other grafting products like Allograft or Autograft;

        r.      Discs: Use on multiple levels or on a level outside of L2-S1.

118. Dr. Durrani and the Hospitals in which he performed surgeries repeatedly used BMP-2 in these non-FDA-approved manners.

## THE NON-COMPLIANCE WITH THE REGULATORY PROCESS

119. The PMA 000058 "Conditions of Approval" specifies the following condition: "Before making any change affecting the safety or effectiveness of the device, submit a PMA supplement for review and approval by the FDA ... [a] PMA supplement or alternate submission shall comply with applicable requirements under 21 C.F.R. 814.39[.]"

120. 21 C.F.R. 814.39 requires a PMA supplement pursuant to subsection (a)(1) for new indications of use of the device and pursuant to subsection (a)(6) for changes in components.

121. The PMA 000058 "Conditions of Approval" notes the post-marketing reporting requirement imposed by 21 C.F.R. 814.84, particularly "Identification of changes described in 21 C.F.R. 814.39(a)." Medtronic did not comply with this requirement relating to the intended uses and componentry.

122. The FDA can impose post-approval requirements in the PMA pursuant to 21 C.F.R. 814.82, and this fact results in the device being characterized as "restricted" pursuant to 21 U.S.C. § 360j(e) for purposes of 21 U.S.C. § 352(q). Section 352(q) states that any restricted device that is distributed or offered for sale with false or misleading advertising is "misbranded."

123. "Indications for use" is a necessary part of the PMA application and the "Indications for use" are required to be limited by the application. Any different use is inconsistent with the PMA.

124. A device that fails to meet the requirements of the PMA or 21 C.F.R. 814 is "adulterated" as defined by 21 U.S.C. § 351(f).

125. 21 C.F.R. 801.6 defines a misleading statement related to a DIFFERENT device contained in the label delivered with the device intended to be used will render the device to be used misbranded.

126. Medtronic did not apply for a PMA supplement, as required by the FDA generally and PMA 000058 specifically, for the off-label uses, nor did it provide warnings of the risks known about the off-label uses. All named Defendants in these cases knew about the occurrences of off-label use.

127. The PMA requires an application prior to marketing for new indicated uses by incorporating the federal requirements and explicitly reciting the text of 21 C.F.R. 814.39 and 814.84 and by specifically stating the range of indicated uses on the PMA.

## V.     MEDTRONIC

128.    In or about 2001, Medtronic began preparing for the launch of two spinal fusion products, PYRAMID and INFUSE (BMP-2), which it projected would enjoy broad application with spinal surgeons and their patients on a nationwide basis.

129.    Medtronic anticipated that both products would initially be limited in application.

130.    Motivated by greed and a desire to gain competitive advantage in the marketplace, Medtronic began a course of conduct designed to broaden the application of both products by end-users. The course of conduct involved fraud, false statements, material misrepresentation, and deceit for the purpose of broadening the sales of these products beyond that which the usual acceptance within the scientific community or regulatory approval would otherwise allow.

131.    On or after July 2, 2002, Medtronic received notification that its Pre-Market Approval application for its BMP-2/Infuse bone graft products had been approved by the FDA. However, such approval was limited to the application of the device from the L4 through S1 levels. Further, the approval mandated the conduct of post-approval studies to evaluate the long-term performance of the BMP-2 bone graft and to study the potential side effects and complications such as the promotion of tumors by the bone morphogenetic protein component of BMP-2. Other studies were conducted as well. See "Allegations against Medtronic in the Unsealed Mississippi False Claims Case."

132.    Medtronic engaged in a fraudulent course of conduct designed to maximize its revenues from BMP-2, regardless of whether it would eventually be allowed to remain on the market.

133.    One of the physicians Medtronic co-opted into its fraudulent scheme was a Thomas A. Zdeblick, M.D. Dr. Zdeblick was an orthopedic surgeon whose invention, the LT-Cage, was the only approved device to act as the delivery vehicle for BMP-2 into the body.

134. Dr. Zdeblick enjoyed a position within the scientific community as a Key Opinion Leader, and he was both a practicing orthopedic surgeon and professor at the University of Wisconsin.

135. In one of Dr. Zdeblick's first attempts to tout his LT-Cage and rhBMP-2, which would become the active ingredient in the ultimate Infuse/BMP-2 product, he encountered some drawbacks to his goal of promoting his and Medtronic's products, which arose from the policy of certain industry journals, including the journal *Spine,* which followed industry standards before printing peer-reviewed material. See article in the journal *Spine,* published in 2000.

136. Not only were the drawbacks related to industry publishing standards, but the National Consumer Health Information and Health Promotion Act of 1976 enacted certain provisions at 42 U.S.C. § 300u, et seq., whereby the Federal Government had entered the field of medical research publication. Such standards promulgated by the Secretary of the predecessor to the U.S. Department of Health and Human Services required that applications for grants and contracts must be subject to "appropriate peer review." See 42 U.S.C. § 300u-1.

137. The drawbacks encountered with the peer-reviewed *Spine* article were as follows:

      a.    Attribution that the study was "sponsored by Medtronic Sofamor Danek, Inc.;"

      b.    The study was conducted under FDA regulations, and was "...designed as a prospective, multicenter, nonblinded, randomized, and controlled pilot study;" and

      c.    It was accompanied by a cautionary comment, or Point of View, which minimized the exuberance and import of the article.

138. In the article, BMP-2 was touted by Zdeblick and the co-authors as the potential realization of a dream of Dr. Marshall Urist, a revered pioneer in the industry and discoverer of BMP, where it closed with the following: "...it is encouraging to note that Marshall Urist's seminal observation made more than 34 years ago may finally come to clinical fruition."

139.     In the Point of View, a Dr. John O'Brien of London questioned whether there could be long-term problems associated with the product. He treated Zdeblick's study with caution and pointed out that simple plaster of Paris has achieved the same or similar results more than 50 years prior. He posited that, "[p]erhaps vascularization…fixation procedures are as important as the biochemical composition of the 'filler.'"

140.     Vascularization is achieved through removal of the disc material between two vertebral bodies and then the scraping of the surfaces of the vertebral bodies in a fusion procedure; fixation is the process of securing the motion segment through medical hardware. In other, if the alternative proposed by Dr. O'Brien proved to achieve equivalent or better results, Zdeblick and Medtronic's Infuse/BMP-2 products would be useless and unnecessary.

141.     Certain efforts would follow in an attempt to alleviate the drawbacks encountered with the 2000 *Spine* journal article.

142.     In 2002, Dr. Zdeblick was installed as the sole editor-in-chief of a medical journal known prior to his installation as the *Journal of Spinal Disorders*. Prior to his installation, the journal enjoyed a fourteen year history under the co-editorship of Dr. Dan Spangler and Dr. Tom Ducker. Once installed, Dr. Zdeblick successfully supplanted Drs. Dan Spengler and Tom Ducker and became the sole editor-in-chief, a position which would enable him to have greater control and would aid his participation in the fraudulent scheme.

143.     During this same time period, Dr. Zdeblick also enjoyed a position on the associate editorial board of the medical journal *Spine*, the leading publication covering all disciplines relating to the spine.

144. In one of Dr. Zdeblick's actions as editor-in-chief, he set about re-purposing the journal in a way that would aid him in the furtherance of the fraudulent scheme through the streamlining of the publication process.

145. In furtherance of the fraudulent scheme, Dr. Zdeblick re-purposed the journal and renamed it the *Journal of Spinal Disorders and Techniques* (JSDT), announcing that the new journal was "entering a new partnership with *Spine*." As part of this partnership, *Spine* would "continue to function as a broad-based scientific journal" tailored to both clinicians and scientists. However, the *Journal of Spinal Disorders and Techniques* would be directed solely to physicians in clinical practice.

146. Dr. Zdeblick's stated goal was "to provide a forum for up-to-date techniques...", and in furtherance of that goal, Dr. Zdeblick announced that his journal would publish Class II or better clinical articles but would "occasionally accept cutting edge articles with less than one year follow-up." To justify this streamlined process, Dr. Zdeblick claimed as his goal the ability of his journal "to keep up with the fast pace of progress in the treatment of spinal patients."

147. Arm-in-arm with Medtronic and others, Dr. Zdeblick would in short order abuse his position of trust as the editor-in-chief of JSDT.

148. In the October 2002 edition, JSDT published an article entitled, "Anterior Lumbar Interbody Fusion using rhBMP-2 with Tapered Interbody Cages." This article was co-authored by, among others, Curtis A. Dickman, M.D., who was a developer of Medtronic's PYRAMID plate and who has been paid significant sums by Medtronic through royalty agreements, consulting agreements, and education training and speaking agreements.

149. In addition to his interest in the PYRAMID plate, Dr. Dickman had assisted Medtronic in the approval process for Infuse/BMP-2. As part of the pre-approval hearing process, Dr. Dickman

and his Barrow Neurological Associates Group of Phoenix, Arizona had submitted a letter to the meeting of the FDA's Orthopedics and Rehabilitation Devices Advisory Panel, which met on January 10, 2002. In that letter, Dr. Dickman represented that "approval of BMP would provide a significant advance for patient outcome and satisfaction following spinal fusion."

150.    In the October 2002 issue of JSDT touting the benefits of Infuse/BMP-2, Zdeblick and others failed to disclose their financial ties to Medtronic, though industry standards require such acknowledgement. Not only did Dr. Zdeblick fail to disclose that he profited from each and every surgery which Infuse/BMP-2 was used through rights in the exclusive delivery vehicle, his LT-Cage, but no reference whatsoever to their financial ties to Medtronic was made either by Dr. Zdeblick or Dr. Dickman.

151.    For years, the recognized gold standard for spinal bone grafts has been the use of autogenous bone, or bone harvested from the patient's own iliac crest, or hip bone. Medtronic designed to have its Infuse/BMP-2 product supplant autogenous bone as the gold standard in the medical community, and utilized false statements, a fraudulent enterprise and the support of Federal funds to do so.

152.    As part and parcel of Medtronic's fraudulent scheme, the October 2002 study was published in Dr. Zdeblick's journal three months after Medtronic received FDA approval for Infuse. As the article shows, it was actually received on March 28, 2002 or after Dr. Zdeblick had accomplished installment as the editor-in-chief, and was accepted by Dr. Zdeblick's journal for publication on July 30, 2002.

153.    At the same time Dr. Zdeblick's journal was publishing the initial article on Infuse, Dr. Zdeblick was already finalizing and preparing for subsequent publication a follow-up article to tout Infuse potentially as the new gold standard. A second article, co-authored by Dr. Zdeblick and

two other co-authors of the original article, was entitled "Is Infuse Bone Graft Superior to Autograft Bone? An Integrated Analysis of Clinical Trials using the LT-Cage Lumbar Tapered Fusion Device."

154.     This second article was published in Vol. 2 of 2003 and once again, there was no mention of Dr. Zdeblick's financial ties to Medtronic.

155.     This second article would serve as the second covert advertisement for the Infuse product, and the article states that "the purpose of our analysis was to investigate the potential statistical superiority of Infuse bone graft to autograft…"

156.     This second article went on to announce the July 2002 FDA approval of rhBMP-2.

157.     This article included as an "acknowledgment" an expression of gratitude to the physicians "who provided patients for this study and to the clinic research group at Medtronic Sofamor Danek for their help in data collection and statistical analyses." However, the article still failed to advise the medical community that some or all of the authors reaching these conclusions touted as monumental had direct financial interests tied to those conclusions.

158.     Rather, the failure to report these clear conflicts of interest on the part of those holding positions of trust both within the medical community and over patients was part of Medtronic's fraudulent enterprise. However, unchecked by appropriate peer review, Medtronic was able to systematically accomplish their goals.

159.     In its 2003 Annual Report, and without recognizing that Zdeblick was being paid by Medtronic, Medtronic cited to Zdeblick's 2003 as reporting that Infuse "…may become the new gold standard in spinal fusion surgery."

160.    By its 2006 Annual Report, if not earlier, Medtronic had removed all doubt, declaring that after its introduction in 2002, "Infuse Bone Graft quickly became the gold standard for certain types of lumbar fusion."

161.    Medtronic's fraudulent scheme was successful and resulted in a revenue stream ranging from 700 to 900 million dollars per year.

162.    It has been reported that around the same time these stories about Infuse were published, editors at the Spine Journal began receiving complaints from doctors around the country who were pointing out contradictions between papers published by doctors with financial ties to Medtronic and other data involving Infuse complications.' See *Journal Sentinel* article of John Fauber.

163.    Through the use of these sham consulting, royalty and education/training agreements with its physician agents in this fraudulent enterprise, Medtronic has reaped windfalls in the billions of dollars. Medtronic has used this fraudulent enterprise and civil conspiracy to drive its vast profits and enhance its market position beyond that which it would have realized without engaging willfully, knowingly and potentially deliberate, conscious, or reckless indifference in the fraudulent enterprise and fraudulent concealment. See Mississippi case.

164.    Defendants had full knowledge of all these facts pertaining to Medtronics.

## VI.    FDA PUBLIC HEALTH NOTIFICATION

165.    On July 1, 2008 the FDA issued a Public Health Notification entitled "Life-Threatening Complications Associated with Recombinant Human Bone Morphogenetic Protein in Cervical Spine Fusion."

166.    This notification was sent to health care practitioners all across the United States warning of the complications associated with BMP-2, specifically when used in the cervical spine.

167.    In the notification the FDA stated they received at least 38 reports of complications during the prior four years with the use of BMP-2 in cervical spine fusions.

168.    The complications were associated with swelling of the neck and throat areas, which resulted in compression of the airway and/or neurological structures in the neck.

169.    Some reports describe difficulty swallowing, breathing or speaking and severe dysphagia following cervical spine fusion using BMP-2 products had also been reported.

170.    The notification further stated that, "since the safety and effectiveness of rhBMP for treatment of cervical spine conditions has not been demonstrated, and in light of the serious adverse events described above, FDA recommends that practitioners either use approved alternative treatments or consider enrolling as investigators in approved clinical studies.

171.    The Notification further emphasized the importance of fully informing patients of these potential risks and said that patients treated with BMP-2 in the cervical spine should know:

> s.    The signs and symptoms of airway complications, including difficulty breathing or swallowing, or swelling of the neck, tongue, mouth, throat and shoulders or upper chest area
>
> t.    That they need to seek medical attention immediately at the first sign of an airway complication
>
> u.    That they need to be especially watchful 2-14 days after the procedure when airway complications are more likely to occur
>
> v.    rhBMP-2 (contained in Infuse Bone Graft) has received pre-market approval for fusion of the lumbar spine in skeletally mature patients with degenerative disc disease at one level from L2-S1 and for healing of acute, open tibial shaft fractures stabilized with an IM nail and treated within 14 days of the initial injury

172.    Additionally, BMP is not approved in any manner for use in patients who are skeletally immature (<18 years of age) or pregnant.

173.    Dr. Durrani and the Hospitals ignored ALL of these warnings and used BMP-2 in cervical spine surgeries, children, and those with known compromising factors such as osteoporosis, smoking, and diabetes.

174.    Furthermore, the Notification stated that the FDA requires hospitals and other user facilities to report deaths and serious injuries associated with the use of medical devices.

175.    The Hospitals that allowed Dr. Durrani to use BMP-2 in their facilities failed to report any complications resulting from his use of BMP-2.

## VII.   SENATE FINANCE COMMITTEE REPORT

176.    Medtronic's actions did not go unnoticed, and in June of 2011 the Senate Finance Committee began an investigation into the fraudulent actions of Medtronic.

177.    Medtronic produced more than 5,000 documents pertaining to 13 different studies of BMP-2 for the investigation.

178.    On October 25, 2012, Senate Finance Committee Chairman Max Baucus (D-Mont.) and senior member Chuck Grassley (R-Iowa) released the results of their 16-month investigation into Medtronic, which revealed questionable ties between the medical technology company and the physician consultants tasked with testing and reviewing Medtronic products.

179.    The investigation revealed that Medtronic employees collaborated with physician authors to edit and write segments of published studies on BMP-2/Infuse without publicly disclosing this collaboration.

180.    These fraudulently-produced studies may have inaccurately represented BMP-2's risks and may have placed added weight on the side effects of alternative treatments.

181.   The Senate investigation further found that Medtronic also maintained significant, previously undisclosed financial ties with physicians who authored studies about BMP-2, making $210 million in payments to physicians over a 15-year period.

182.   Senator Baucus stated, "Medtronic's actions violate the trust patients have in their medical care. Medical journal articles should convey an accurate picture of the risks and benefits of drugs and medical devices, but patients are at serious risk when companies distort the facts the way Medtronic has. Patients everywhere will be better served by a more open, honest system without this kind of collusion."

183.   Senator Grassley stated, "The findings also should prompt medical journals to take a very proactive approach to accounting for the content of the articles along with the authorship of the articles and the studies they feature. These publications are prestigious and influential, and their standing rests on rigorous science and objectivity. It's in the interest of these journals to take action, and the public will benefit from more transparency and accountability on their part."

184.   Major findings of the investigation include:

        a.   Medtronic was involved in drafting, editing, and shaping the content of medical journal articles authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic. The company's role in authoring or substantially editing these articles was not disclosed in the published articles. Medical journals should ensure that any industry role in drafting articles or contributions to authors is fully disclosed.

        b.   Medtronic paid a total of approximately $210 million to physician authors of Medtronic-sponsored studies from November 1996 through December 2010 for consulting, royalty and other arrangements.

c.  An e-mail exchange shows that a Medtronic employee recommended against publishing a complete list of adverse events, or side effects, possibly associated with BMP-2/Infuse in a 2005 *Journal of Bone and Joint Surgery* article.

d.  Medtronic officials inserted language into studies that promoted BMP-2 as a better technique than an alternative by emphasizing the pain associated with the alternative.

e.  Documents indicate that Medtronic prepared one expert's remarks to the FDA advisory panel meeting prior to BMP-2 being approved. At the time, the expert was a private physician but was later hired to be a vice president at Medtronic in 2007.

f.  Medtronic documents show the company successfully attempted to adopt weaker safety rules for a clinical trial studying BMP-2 in the cervical spine that would have allowed the company to continue the trial in the event that patients experienced severe swelling in the neck.

## VIII.  YODA STUDY

185.  In response to the various controversies surrounding BMP-2/Infuse, including a June 2011 article in the journal *Spine,* the Yale University Open Data Access (YODA) team reached an agreement for Medtronic to provide full individual participant data from all their trials of rhBMP-2 and allow unrestricted independent re-analysis of this data.

186.  The YODA study involved research teams at two universities – the University of York and the Oregon Health and Science University.

187.  The review focused exclusively on the use of rhBMP-2 in patients undergoing spinal fusion surgery for treatment of degenerative disc disease, spondylolisthesis, or any other relevant spinal condition.

188.    The three main objectives of the study were: 1) to examine the potential benefits of BMP-2, 2) to examine the potential harms of BMP-2, and 3) to assess the reliability of the published evidence base.

189.    Medtronic submitted data from 17 studies, including 12 randomized controlled trials (RCTs).

190.    In total, the YODA study analyzed the data from 1,409 participants.

191.    Though the results showed moderate success with fusions as a result of BMP-2, the study found that BMP-2 results in several different complications including: arthritis, implant-related events, retrograde ejaculation, wound complications, and neurological, urogenital, and vascular events.

192.    In regard to the alleged tampering with the peer-reviewed studies by Medtronic, the YODA study found that only two out of twenty peer-reviewed journal publications reported a comprehensive list of all adverse events that occurred during the studies.

193.    Furthermore, the way in which adverse event data was presented in the literature was inconsistent, and the rationale for presenting some adverse events but not others was rarely clear.

194.    The study concluded that for the period up to 24 months after surgery, treatment with BMP-2 increases the probability of successful fusion (according to Medtronic definitions and reports, which the study noted "were subjective so it is not possible to confirm whether reported successful fusions truly were successful" see YODA Study, p. 35) but this does not translate to clinically meaningful benefits in pain reduction, function, or quality of life. The small benefits in these outcomes observed from six months onward come at the expense of more pain in the immediate post-operative period and a possible increased risk of cancer.

195. Even more relevant to the case against Dr. Durrani and the Hospitals is the YODA study's conclusion that, "[i]t is very important that these findings are expressed clearly and discussed with patients so that they can make informed choices about the type of surgery they would prefer." *Id.*

196. The University of Oregon Study determined that Infuse/BMP-2 is not better than Autograft, while the University of York study determined that Infuse/BMP-2 offers only a slight and not statistically significant advantage over Autograft.

197. The YODA study concluded that Medtronic "misrepresented the effectiveness and harms through selective reporting, duplicate publication, and underreporting."

198. Adverse event categories such as heterotopic bone formation, osteolysis, and radiculitis were not included in participant databases or internal reports; therefore, the safety profile was not fully assessed.

199. The YODA study further concluded that Medtronic was involved in drafting, editing, and shaping the content of medical journal articles on Infuse/BMP-2 authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic. The company's significant role in authoring or substantively editing these articles was not disclosed in the published articles.

200. Medtronic paid a total of approximately $210 million to the physician authors of Medtronic-sponsored studies on Infuse from November 1996 through 2010 for consulting, royalty and other arrangements.

201. An email exchange showed that a Medtronic employee recommended against publishing a complete list of adverse events or side effects possibly associated with Infuse in a 2005 *Journal of Bone and Joint Surgery* article.

202. Medtronic officials inserted language into studies that promoted Infuse as a better technique than an alternative procedure by overemphasizing the pain associated with the alternative procedure.

203. Medtronic's actions violated the trust patients have in their medical care. Medical journal articles should convey an accurate picture of the risks and benefits of drugs and medical devices, but patients are at serious risk when companies distort the facts the way Medtronic has. See United States Senate Committee on Finance, October 2012.

204. Infuse was intended for a single level anterior lumbar interbody fusion performed with all three components in a specific spinal region. The three components are a tapered metallic spinal fusion cage (NOT PLASTIC), a recombinant human (BMP) bone Morphogenetic Protein, and a carrier/scaffold for the BMP and resulting bone. The Infuse product is inserted into the LT-CAGE Lumbar tapered Fusion Device component to form the complete Infuse Bone Graft/LT–Cage Lumbar Tapered Fusion Device. These components must be used as a system. The Infuse Bone Graft component must not be uses without the LT-Cage Lumbar Tapered Fusion Device component.

205. BMP-2 is not supposed to be used in minors.

206. BMP-2 is not supposed to be used with smokers and diabetics because of vascular slowing.

207. BMP-2 should not be used with women in child bearing years.

208. BMP-2 is contraindicated for patients with a known hypersensitivity to rhBMP-2 and should not be used in the vicinity of a resected or extant tumor, in patients with active malignancy, or in patients undergoing treatment for a malignancy.

## IX.    DR. DURRANI AND BMP-2

209.    Despite all of these warning signs, Dr. Durrani, with the full knowledge of the Defendants, continued to use BMP-2 in ways not approved by the FDA, or in an "off-label" manner.

210.    As early as 2007, Dr. Durrani and UC Health knew there were issues with BMP-2 because insurance companies such as Anthem were refusing to pay for BMP-2.

211.    Medtronic provided in writing to Dr. Durrani and CAST the approved uses for Infuse/BMP-2.

212.    However, Dr. Durrani and the Defendants continued to use BMP-2 in off-label ways, including but not limited to:

        a.    Using BMP-2/Infuse in children, despite Medtronic specifically requiring it be used only in "skeletally mature patients;"

        b.    Using it outside the L2-S1 level of the spine;

        c.    Ignoring the requirement that BMP-2/Infuse only be used for Grade 1 spondylolisthesis or Grade 1 retrolisthesis;

        d.    Not requiring at least six months of non-operative treatment prior to the use of BMP-2/Infuse;

        e.    Using BMP-2/Infuse without the required cage;

        f.    Not using the "carrier scaffold" in conjunction with BMP-2/Infuse as required;

        g.    Using BMP-2/Infuse without proper training despite Medtronic's warning, "Caution: Federal (USA) law restricts this device to sale by or on the order of a physician with appropriate training or experience."

213.    Dr. Durrani was a paid consultant for Medtronic.

214. According to Dr. Durrani's own deposition testimony in several cases, Medtronic required one of their representatives to be present in the operating room when its product BMP-2/Infuse is used.

215. Because Medtronic representatives were present in these surgeries, Medtronic knew when Dr. Durrani used BMP-2/Infuse outside the approved uses according to Medtronic's own guidelines.

216. Dr. Durrani was encouraged by Medtronic to obtain peer review and published studies from Medtronic sales representatives to support his use of BMP-2/Infuse.

217. Dr. Durrani was encouraged by Medtronic to be an advocate for his patients and describe how BMP-2/Infuse technology can benefit them.

218. When asked how he got his Medtronic grant, Dr. Durrani responded, "You apply to the Medtronic's corporate and say this is what we want to do, like everybody else in the country applies, and then they come and evaluate the thing and say, "Okay, we think it's worthy. We'll give you the grant."

219. In regard to his role as a Medtronic consultant, Dr. Durrani stated, "If there are certain products that they help us in developing, then they will come to us for a certain consultant role for a certain product development."

220. Dr. Durrani also stated, "I was involved in the development of the minimally invasive spine instrumentation."

221. Dr. Durrani gave conflicting reports on his financial relationship with Medtronic.

222. In a deposition, when asked when his relationship with Medtronic began, Dr. Durrani responded "2000-it's 2003, '04. Something in that category. I'm not sure. It's on the Medtronic website. You can go look at it."

223. Medtronic's website has no information regarding their relationship with Dr. Durrani.

224. In another deposition, Dr. Durrani stated he began his relationship with Medtronic in "2005 or '06."

225. Dr. Durrani also gave conflicting reports on how much compensation he received from Medtronic for his consultation services.

226. In one deposition, Dr. Durrani stated in response to an inquiry as to how much payment he received, "It's a standard compensation. Again, it's on the website, how much they've paid us."

227. Again, this information is not available on the Medtronic website.

228. In another deposition, when asked if he received income from Medtronic, Dr. Durrani replied, "No, I don't."

229. When questioned further if he received a fee as a consultant, he stated, "If you do a work, there is a contractual obligation that they have to pay you. As I told you in my last deposition, they did declare it on their website, so you can actually go on the website and see how much they paid."

230. In another deposition, Dr. Durrani stated that he received, "less than $10,000 in ten years" from Medtronic.

231. An email dated July 30, 2008 from Medtronic Senior Product Manager Katie Stamps to Dr. Durrani states that she "is in the process of working on the renewal of your [Dr. Durrani's] consulting agreement." As stated, this information is not available on Medtronic's website, nor is any information relating to Dr. Durrani's role as a consultant for Medtronic.

232. A CCHMC packet relating to its Orthopedics department indicated that Dr. Durrani received $60,000 in grants, contracts, or industry agreements from Medtronic Sofamor Danek in FY 2008.

233.    Financial information discovered concerning Dr. Durrani's relationship with Medtronic was found in Dr. Durrani's biography on the website for the Orthopaedic & Spine Institute, which Dr. Durrani currently operates in Pakistan. The biography states that "Dr. Atiq Dr. Durrani has also received the Clinical Spine Fellowship Grant by the Department of Orthopaedic Surgery which was funded by Medtronic Sofamor Danek with a budget of $59,170 per year." See http://www.osi.com.pk/doctor/dr-atiq-Dr. Durrani-md/.

234.    When a request was made to Medtronic regarding its affiliation with Dr. Durrani, the Medtronic Supplier Relations Team stated that Dr. Durrani's "name [is] not listed in our system."

235.    Medtronic further responded to the Deters Law Firm's request that the firm would need a "Vendor I.D. Number," which neither Medtronic nor any other party has provided.

236.    David Rattigan, was Dr. Durrani's main Medtronic representative from Bahler Medical.

237.    David Rattigan and Medtronic have the same lawyer. Despite the Deters Law Firm's willingness to cooperate in scheduling the date for a deposition, they have refused until recently. Mr. Rattigan's deposition was taken June 5, 2015.

238.    In summary, clients of the Deters Law Firm, with the full knowledge and intentional consent of all Defendants, became unsuspecting experiments for real world testing of Medtronic hardware and BMP-2, by and through Dr. Durrani and CAST, who had secret financial connections to Medtronic, improper motives, and submitted false claims. The government paid for many of these improper and unregulated experiments as a result of the false claims made by Dr. Durrani, with the knowledge of Medtronic, under the veil of "medically necessary" surgeries.

239.    Despite repeated requests, Medtronic has refused to cooperate in providing any requested information and is actively downplaying their connections to Dr. Durrani.

## X.   THE DEFENDANTS AND BMP-2

240.   The purpose of the background information on the following Defendants and BMP-2 concerning other hospitals is to show the egregious methods, which upon information and belief were used at all hospitals.

241.   The Defendants allowed and encouraged these practices by Dr. Durrani for the sole purpose of money and greed.

242.   David Rattigan was always present in Dr. Durrani's operating rooms as a representative of Medtronic.

243.   David Rattigan's sole job was to deliver the BMP-2/Infuse to the Hospitals and make sure that it was inserted correctly into the patient.

244.   David Rattigan's presence in the OR further supports the Defendants awareness of Dr. Durrani's fraudulent use of BMP-2/Infuse.

245.   **Informed Consent for Surgical or Medical Procedure and Sedation:**

It is the responsibly of the attending physician to obtain informed consent prior to the procedure. The patient, or his/her representative, will be advised by his/her physician of:

   a. The explanation of the procedure

   b. The benefits of the procedure

   c. The potential problems that might occur during recuperation

   d. The risks and side effects of the procedure which could include but are not limited to severe blood loss, infection, stroke or death.

   e. The benefits, risks and side effect of alternative procedures including the consequences of declining this procedure or any alternative procedures.

   f. The likelihood of achieving satisfactory results

Completion of the "Consent to Hospital and Medical Treatment" form to examine and treat is NOT sufficient as consent to perform a surgical procedure, invasive procedure, or for medical regimens of substantial risk or that are the subject of human investigation or research.

246. The Defendants had the responsibility to carry out these consent rules.

247. Dr. Durrani oftentimes used BMP-2 "off-label" when performing surgeries.

248. BMP-2 is manufactured, marketed, sold and distributed by Defendant Medtronic under the trade name "Infuse."

249. Dr. Durrani is a consultant for Medtronic.

250. Defendants did not inform Plaintiffs of Durrani's financial interest, conflicts of interest or consulting arrangement with Medtronic.

251. Medtronic, provided in writing to Dr. Durrani the approved uses for BMP-2, the substance also referred to as Infuse, which is a bone morphogenic protein, used as an artificial substitute for bone grafting in spine surgeries.

252. BMP-2 is not approved by the Food and Drug Administration for use in the cervical and thoracic spine.

253. BMP-2 is neither safe nor approved for use on children less than twenty one (21) years of age.

254. For use in spinal surgery, BMP-2/Infuse is approved by the FDA for a limited procedure, performed on a limited area of the spine, using specific components. Specifically, the FDA approved Infuse for one procedure of the spine: Anterior Lumbar Interbody Fusion ("ALIF" or "Anterior" approach); and only in one area of the spine: L4 to S1; and only when used in conjunction with FDA-Approved Components: LT-CAGE Lumbar Tapered Fusion Device Component ("LT-CAGE")

255. Use of Infuse in cervical or thoracic surgery, or use through the back (posterior), or side (lateral), or on areas of the spine outside of the L4-S1 region (e.g., the cervical spine), or using

components other than or in addition to the LT-CAGE is not approved by the FDA, and thus such procedures and/or use of non-FDA approved componentry is termed "off-label."

256. When used off-label, Infuse frequently causes excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord. When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs.

257. The product packaging for BMP-2/Infuse indicates it causes an increased risk of cancer four (4) times greater than other bone graft alternatives.

258. Dr. Durrani and Children's Hospital personnel did not disclose to Plaintiffs their intent to use BMP-2/Infuse, and further, did not disclose their intent to use BMP-2/Infuse in a way not approved by the FDA.

259. Dr. Durrani used BMP-2 in Plaintiff in a manner not approved by Medtronic or the FDA.

260. Defendants did not inform Plaintiffs that Dr. Durrani used Infuse/BMP-2 in his surgeries.

261. Plaintiffs would not have allowed BMP-2 to be used by Dr. Durrani in his surgery in a manner that was not approved by the FDA or Medtronic, Infuse/BMP-2's manufacturer.

262. Plaintiffs would not have consented to the use of BMP-2 in Plaintiff's body if informed of the risks by Dr. Durrani or any Children's Hospital personnel.

263. The written informed consent of Dr. Durrani signed by Plaintiffs lacked the disclosure of Infuse/BMP-2's use in his procedures.

264. Plaintiffs never received a verbal disclosure of Infuse/BMP-2 from Dr. Durrani or any Children's Hospital personnel.

265. Medtronic specifically required Infuse/BMP-2 only be used in "skeletally mature patients" with degenerative disc disease.

266.    Medtronic required at least six (6) months of non-operative treatment prior to use of Infuse/BMP-2.

267.    Dr. Durrani regularly used Infuse/BMP-2 without this six (6) month non-operative treatment.

268.    Medtronic required BMP-2 always be used in conjunction with a metal LT cage.

269.    Dr. Durrani regularly used BMP-2 without a proper LT cage in his surgeries.

## INFUSE/BMP-2

270.    Dr. Durrani oftentimes used BMP-2 "off-label" when performing surgeries.

271.    BMP-2 is manufactured, marketed, sold and distributed by Defendant Medtronic under the trade name "Infuse."

272.    Dr. Durrani is a consultant for Medtronic.

273.    Defendants did not inform Plaintiff of Durrani's financial interest, conflicts of interest or consulting arrangement with Medtronic.

274.    Medtronic, provided in writing to Dr. Durrani and CAST the approved uses for BMP-2, the substance also referred to as Infuse, which is a bone morphogenic protein, used as an artificial substitute for bone grafting in spine surgeries.

275.     BMP-2 is not approved by the Food and Drug Administration for use in the cervical and thoracic spine.

276.    BMP-2 is neither safe nor approved for use on children less than twenty one (21) years of age.

277.    For use in spinal surgery, BMP-2/Infuse is approved by the FDA for a limited procedure, performed on a limited area of the spine, using specific components. Specifically, the FDA approved Infuse for one procedure of the spine: Anterior Lumbar Interbody Fusion ("ALIF" or

"Anterior" approach); and only in one area of the spine: L4 to S1; and only when used in

conjunction with FDA-Approved Components: LT-CAGE Lumbar Tapered Fusion Device

Component ("LT-CAGE")

278.    Use of Infuse in cervical or thoracic surgery, or use through the back (posterior), or side

(lateral), or on areas of the spine outside of the L4-S1 region (e.g., the cervical spine), or using

components other than or in addition to the LT-CAGE is not approved by the FDA, and thus

such procedures and/or use of non-FDA approved componentry is termed "off-label."

279.    When used off-label, Infuse frequently causes excessive or uncontrolled (also referred to

as "ectopic" or "exuberant") bone growth on or around the spinal cord. When nerves are

compressed by such excessive bone growth, a patient can experience, among other adverse

events, intractable pain, paralysis, spasms, and cramps in limbs.

280.    The product packaging for BMP-2/Infuse indicates it causes an increased risk of cancer

four (4) times greater than other bone graft alternatives.

281.    Dr. Durrani, CAST staff and employees, and West Chester/UC Health personnel did not

disclose to Plaintiff their intent to use BMP-2/Infuse, and further, did not disclose their intent to

use BMP-2/Infuse in a way not approved by the FDA.

282.    Dr. Durrani used BMP-2 in Plaintiff in manners not approved by Medtronic or the FDA.

283.    Defendant's did not inform plaintiff that Dr. Durrani used Infuse/BMP-2 in his surgery.

284.    Plaintiff would not have allowed BMP-2 to be used by Dr. Durrani in his surgery in a

manner that was not approved by the FDA or Medtronic, Infuse/BMP-2's manufacturer.

285.    Plaintiff would not have consented to the use of BMP-2 in his body if informed of the

risks by Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel.

286.    The written informed consent of Dr. Durrani, CAST, and West Chester/UC Health signed by Plaintiff lacked the disclosure of Infuse/BMP-2's use in his procedure.

287.    Plaintiff never received a verbal disclosure of Infuse/BMP-2 from Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel.

288.    Medtronic specifically required Infuse/BMP-2 only be used in "skeletally mature patients" with degenerative disc disease.

289.    Medtronic required at least six (6) months of non-operative treatment prior to use of Infuse/BMP-2.

290.    Dr. Durrani regularly used Infuse/BMP-2 without this six (6) month non-operative treatment.

291.    Medtronic required BMP-2 always be used in conjunction with a metal LT cage.

292.    Dr. Durrani regularly used BMP-2 without a proper LT cage in his surgeries.

## PUREGEN

293.    Dr. Durrani oftentimes used Puregen when performing surgeries.

294.    Puregen is a product produced by Alphatec Spine.

295.    Dr. Durrani was and is a paid consultant for Alphatec Spine.

296.    Dr. Durrani has an ownership stake in the Alphatec Spine.

297.    Puregen has never been approved by the FDA for any human use.

298.    Puregen is now removed from the market for any use.

299.    Dr. Durrani used the product Puregen as bone graft substitute similar to Infuse/BMP-2 during spinal surgeries.

300.    Dr. Durrani, CAST staff and employees, and West Chester/UC Health personnel did not disclose their intent to use Puregen, nor did they inform Plaintiff that it was a product that was not approved by the FDA for human use.

301.    Dr. Durrani used Puregen in Plaintiff in manners not approved by the FDA.

302.    Plaintiff was not informed by Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel that Dr. Durrani used Puregen in Plaintiff's surgery.

303.    Plaintiff would not have allowed Puregen to be used by Dr. Durrani in his surgery in a manner that was not approved by the FDA.

304.    Plaintiff would not have consented to the use of Puregen in his body if informed of the risks by Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel.

305.    The written informed consent of Dr. Durrani and CAST signed by Plaintiff lacked the disclosure of Puregen's use in his procedure.

306.    Plaintiff never received a verbal disclosure of Puregen from Dr. Durrani, CAST staff and employees, or any West Chester/UC Health Personnel.

### DR. DURRANI COUNTS:

### COUNT I: NEGLIGENCE

307.    Defendant Dr. Durrani owed his patient, Plaintiff, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

308.    Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for

surgery, improper performance of the surgeries, and improper follow-up care addressing a patient's concerns.

309.    As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant Dr. Durrani, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT II: BATTERY

310.    Dr. Durrani committed battery against Plaintiff by performing a surgery that was unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent, inter alia, by using BMP-2, PureGen and/or Baxano in ways and for surgeries not approved by the FDA and medical community, and by the failure to provide this information to Plaintiff.

311.    Plaintiff would not have agreed to the surgery if he knew the surgery was unnecessary, not approved by the FDA, and not indicated.

312.    As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT III: LACK OF INFORMED CONSENT

313.    The informed consent forms from Dr. Durrani and CAST, which they required Plaintiff to sign, failed to fully cover all the information necessary and required for the procedures and surgical procedures performed by Dr. Durrani.  Dr. Durrani and CAST each required an informed consent release.

314.    In addition, no one verbally informed Plaintiff of the information and risks required for informed consent at the time of or before the Plaintiff's surgery.

315.    Dr. Durrani failed to inform Plaintiff of material risks and dangers inherent or potentially involved with his surgery and procedures.

316. Had Plaintiff been appropriately informed of the need or lack of need for surgery and other procedures and the risks of the procedures, Plaintiff would not have undergone the surgery or procedure.

317. As a direct and proximate result of the lack of informed consent, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

318. Dr. Durrani's conduct as described above was intentional and reckless.

319. It is outrageous and offends against the generally accepted standards of morality.

320. It was the proximate and actual cause of Plaintiff's psychological injuries, emotional injuries, mental anguish, suffering, and distress.

321. Plaintiff suffered severe distress and anguish so serious and of a nature that no reasonable man or woman would be expected to endure.

## COUNT V: FRAUD

322. Dr. Durrani made material, false representations to Plaintiff and his insurance company related to Plaintiff's treatment including: stating the surgery was necessary, that Dr. Durrani "could fix" Plaintiff, that more conservative treatment was unnecessary and futile, that the surgeries would be simple or was "no big deal", that Plaintiff would be walking normally within days after each surgery, that the procedures were medically necessary and accurately reported on the billing to the insurance company, that the surgeries were successful, and that Plaintiff was medically stable and ready to be discharged.

323. Dr. Durrani also concealed the potential use of Infuse/BMP-2 and/or Puregen in Plaintiff's surgery, as well as concealed other information, when he had a duty to disclose to Plaintiff his planned use of the same.

324.    These misrepresentations and/or concealments were material to Plaintiff because they directly induced the Plaintiff to undergo his surgery.

325.    Dr. Durrani knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

326.    Dr. Durrani made the misrepresentations before, during, and after the surgeries, with the intent of misleading Plaintiff and his insurance company into relying upon them. Specifically, the misrepresentations were made to induce payment by the insurance company, without which Dr. Durrani would not have performed the surgery, and to induce Plaintiff to undergo the surgery without regard to medical necessity and only for the purpose of receiving payment.

327.    The misrepresentations and/or concealments were made during the Plaintiff's office visits at Dr. Durrani's CAST offices and/or at West Chester Hospital/UC Health.

328.    Plaintiff was justified in his reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust the facility.

329.    As a direct and proximate result of the aforementioned fraud, Plaintiff did undergo surgery, which was paid for in whole or in part by his insurance company, and suffered all damages requested in the prayer for relief.

### COUNT VI: SPOLIATION OF EVIDENCE

330.    Dr. Durrani willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, emails, paperwork, and related evidence.

331.    Dr. Durrani spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

332.    Dr. Durrani's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## CAST COUNTS:

## COUNT I: VICARIOUS LIABILITY

333.    At all times relevant, Defendant Dr. Durrani was an agent, and/or employee of CAST.

334.    Dr. Durrani is in fact, the owner of CAST.

335.    Defendant Dr. Durrani was performing within the scope of his employment with CAST during the care and treatment of Plaintiff.

336.    Defendant CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

337.    Defendant CAST is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

338.    As a direct and proximate result of Defendant CAST's acts and omissions, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT II: NEGLIGENT HIRING, RETENTION, & SUPERVISION

339.    CAST provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

340.    CAST and Dr. Durrani participated in experiments using BMP-2 and/or Puregen bone graft on patients, including Plaintiff, without obtaining proper informed consent thereby causing harm to Plaintiff.

341.    CAST breached its duty to Plaintiff, inter alia, by not supervising or controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at CAST.

342.     The Safe Medical Device Act required entities such as CAST to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

343.     Such disregard for and violations of federal law represents strong evidence that CAST negligently hired, retained, and supervised Dr. Durrani.

344.     As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by Dr. Durrani, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT III: FRAUD

345.     Upon information and belief, Plaintiff believes the bills requested by Plaintiff will indicate that CAST falsely represented that Plaintiff's surgery was appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

346.     CAST sent out billing to Plaintiff at his home following his surgery at Children's Hospital.

347.     The exact dates these medical bills were sent out are reflected in those medical bills.

348.     These bills constituted affirmative representations by CAST that the charges related to Plaintiff's surgery were medically appropriate and properly documented.

349.     The bills were sent with the knowledge of CAST that in fact Plaintiff's surgery was not appropriately billed and documented and that the services rendered at Children's Hospital associated with Dr. Durrani were not appropriate.

350.     The bills sent by CAST to Plaintiff falsely represented that Plaintiff's surgery was appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

351.    Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for CAST's services in association with Dr. Durrani's surgery.

352.    As a direct and proximate result of this reliance on the billing of CAST, Plaintiff incurred medical bills that she otherwise would not have incurred.

353.    CAST also either concealed from Plaintiff facts they knew about Dr. Durrani, including that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgery, or misrepresented to Plaintiff the nature of the surgery, and the particular risks that were involved therein.

354.    CAST's concealments and misrepresentations regarding Dr. Durrani, Infuse/BMP-2 or Puregen and the nature and risks of Plaintiff's surgery were material facts.

355.    Because of its superior position and professional role as a medical service provider, CAST had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

356.    CAST intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgery and procedures Dr. Durrani performed on Plaintiff at Children's Hospital.

357.    Plaintiff was unaware that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgery and therefore, was unaware of the health risks of Infuse/BMP-2 or Puregen's use in Plaintiff's spine.

358.    Had Plaintiff known before Plaintiff's surgery that Infuse/BMP-2 or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgery with Dr. Durrani at West Chester Hospital/UC Health.

359.    Plaintiffs are still awaiting itemized billing from Children's Hospital reflecting the exact

totals charged for the use of BMP-2 on the Plaintiff.

360.    As a direct and proximate result of the fraud against Plaintiff by CAST, Plaintiff

sustained all damages requested in the prayer for relief.

## COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

361.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts

physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

362.    CAST's services rendered to Plaintiff constitute a "consumer transaction" as defined in

ORC Section 1345.01(A).

363.    CAST omitted suppressed and concealed from Plaintiffs facts with the intent that

Plaintiffs rely on these omissions, suppressions and concealments as set forth herein.

364.    CAST's misrepresentations, and its omissions, suppressions and concealments of fact, as

described above, constituted unfair, deceptive and unconscionable acts and practices in violation

of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

365.    CAST was fully aware of its actions.

366.    CAST was fully aware that Plaintiffs were induced by and relied upon CAST's

representations at the time CAST was engaged by Plaintiffs.

367.    Had Plaintiffs been aware that CAST's representations as set forth above were untrue,

Plaintiffs would not have used the services of Defendants.

368.    CAST, through its agency and employees knowingly committed the unfair, deceptive

and/or unconscionable acts and practices described above.

369.    CAST's actions were not the result of any bona fide errors.

370.   As a result of CAST's unfair, deceptive and unconscionable acts and practices, Plaintiffs have suffered and continues to suffer damages, which include, but are not limited to the following:

    a.    Loss of money paid

    b.    Severe aggravation and inconveniences

    c.    Under O.R.C. 1345.01 Plaintiffs are entitled to:

        i. An order requiring CAST restore to Plaintiffs all money received from Plaintiffs plus three times actual damages and/or actual/statutory damages for each violation;

        ii. All incidental and consequential damages incurred by Plaintiffs;

        iii. All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

        iv. Such other and further relief that this Court deems just and appropriate.

### COUNT V: SPOLIATION OF EVIDENCE

371.   CAST, through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, billing records, emails, paperwork and related evidence.

372.   CAST, through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

373.   CAST's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## CHILDREN'S HOSPITAL COUNTS:

### COUNT I: VICARIOUS LIABILITY

374.    At all times relevant, Defendant Dr. Durrani was an agent, apparent agent, and/or employee of Children's Hospital.

375.    Dr. Durrani is in fact, a partial owner or shareholder of Children's Hospital.

376.    Defendant Dr. Durrani was performing within the scope of his agency, real or apparent with Children's Hospital during the care and treatment of Plaintiff.

377.    Defendant Children's Hospital is responsible for harm caused by acts of its agents and apparent agents for conduct that was within the scope of agency under the theory of respondeat superior.

378.    Defendant Children's Hospital is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

379.    As a direct and proximate result of Defendant Children's Hospital's acts and omissions, Plaintiff sustained severe and grievous injuries, prolonged pain and suffering, emotional distress, humiliation, discomfort, loss of enjoyment of life, and loss of ability to perform usual and customary activities and incurred substantial medical expenses and treatment.

### COUNT II: NEGLIGENT CREDENTIALING, SUPERVISION, AND RETENTION

380.    As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiff constitute medical negligence, lack of informed consent, battery, and fraud.

381.    Children's Hospital negligently credentialed, supervised, and retained Dr. Durrani as a credentialed physician, violating their bylaws and JCAHO rules by:

a.  Allowing Dr. Durrani to repeatedly violate the Children's Hospital bylaws with it's full knowledge of the same;

b.  Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied for and reapplied for privileges at Children's Hospital;

c.  Ignoring complaints about Dr. Durrani's treatment of patients reported to it by Children's Hospital staff, doctors, Dr. Durrani's patients and by others;

d.  Ignoring information they knew or should have known pertaining to Dr. Durrani's previous privileged time at other Cincinnati area hospitals, including University Hospital, Deaconess Hospital, Good Samaritan Hospital and Christ Hospital.

382.  The Safe Medical Device Act required entities such as Children's Hospital to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

383.  As a direct and proximate result of the negligent credentialing, supervision, and retention of Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

### COUNT III: FRAUD

384.  Upon information and belief, Plaintiff believes the bills requested by Plaintiff will indicate that Children's Hospital used Infuse-BMP-2 and/ or Puregen on the Plaintiff and billing will falsely represent that Plaintiff's surgery was appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

385.  Children's Hospital sent out billing to Plaintiffs insurance at his home following his surgeries at Children's Hospital.

386. The exact dates these medical bills were sent out are reflected in those medical bills.

387. These bills constituted affirmative representations by Children's Hospital that the charges related to Plaintiff's surgery were medically appropriate and properly documented.

388. The bills were sent with the knowledge of Children's Hospital that in fact Plaintiff's surgery were not appropriately billed and documented and that the services rendered at Children's Hospital associated with Dr. Durrani were not appropriate.

389. The bills sent by Children's Hospital to Plaintiffs falsely represented that Plaintiff's surgery were appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

390. Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiffs for Children's Hospital's services in association with Dr. Durrani's surgeries.

391. As a direct and proximate result of this reliance on the billing of Children's Hospital, Plaintiffs incurred medical bills that they otherwise would not have incurred.

392. Children's Hospital also either concealed from Plaintiffs facts they knew about Dr. Durrani, including that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgery, or misrepresented to Plaintiffs the nature of the surgery, and the particular risks that were involved therein.

393. Children's Hospital's concealments and misrepresentations regarding Infuse/BMP-2 or Puregen and the nature and risks of Plaintiff's surgery were material facts.

394. Because of its superior position and professional role as a medical service provider, Children's Hospital had a duty to disclose these material facts to Plaintiffs and a duty to refrain from misrepresenting such material facts to Plaintiffs.

395. Children's Hospital intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiffs in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at Children's Hospital.

396. Plaintiffs were unaware that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgery and therefore, was unaware of the health risks of Infuse/BMP-2 or Puregen's use in Plaintiff's spine.

397. Had Plaintiffs known before surgery that Infuse/BMP-2 or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiffs would not have undergone the surgery with Dr. Durrani at Children's Hospital.

398. Plaintiffs are still awaiting itemized billing from Children's Hospital reflecting the exact totals charged for the use of BMP-2 in Plaintiffs surgery.

399. As a direct and proximate result of the fraud upon Plaintiffs by Children's Hospital, Plaintiffs sustained all damages requested in the prayer for relief.

## COUNT IV: SPOLIATION OF EVIDENCE

400. Children's Hospital through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

401. Children's Hospital through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

402.    Children's Hospital's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT V: OHIO CONSUMER SALES PRACTICES ACT

403.    Although the Ohio Consumer Sales Practices statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

404.    Children's Hospital's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

405.    Children's Hospital omitted suppressed and concealed from Plaintiff facts with the intent that Plaintiff rely on these omissions, suppressions and concealments as set forth herein.

406.    Children's Hospital's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

407.    Children's Hospital was fully aware of its actions.

408.    Children's Hospital was fully aware that Plaintiff was induced by and relied upon Children's Hospital's representations at the time Children's Hospital was engaged by Plaintiff.

409.    Had Plaintiff been aware that Children's Hospital's representations as set forth above were untrue, Plaintiff would not have used the services of Defendants.

410.    Children's Hospital, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

411.    Children's Hospital's actions were not the result of any bona fide errors.

412.    As a result of Children's Hospital's unfair, deceptive and unconscionable acts and practices, Plaintiff has suffered and continues to suffer damages, which include, but are not limited to the following:

a.    Loss of money paid

b.    Severe aggravation and inconveniences

c.    Under O.R.C. 1345.01 Plaintiff is entitled to:

      i.    An order requiring Children's Hospital restore to Plaintiff all money received from Plaintiff plus three times actual damages and/or actual/statutory damages for each violation;

      ii.    All incidental and consequential damages incurred by Plaintiff;

      iii.    All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

## COUNT VI: PRODUCTS LIABILITY

413.    At all times Infuse/BMP-2 is and was a product as defined in R.C. § 2307.71(A)(12) and applicable law.

414.    Children's Hospital (aka supplier) supplied Medtronic's (aka manufacturer) Infuse/BMP-2 for surgery performed by Dr. Durrani on Plaintiff.

415.    Children's Hospital, as a supplier, failed to maintain Infuse/BMP-2 properly.

416.    Children's Hospital did not adequately supply all components required to use Infuse/BMP-2 properly.

417.    Children's Hospital knew or should have known the FDA requirements and Medtronic's requirements for using Infuse/BMP-2.

418.    Children's Hospital stored Infuse/BMP-2 at its facility.

419.    Children's Hospital ordered Infuse/BMP-2 for surgery performed by Durrani.

420.    Children's Hospital did not adequately warn Plaintiff that Infuse/BMP-2 would be used without all FDA and manufacturer required components.

421. Children's Hospital did not gain informed consent from Plaintiff for the use of Infuse/BMP-2, let alone warn of the supplying of the product without FDA and manufacturer requirements.

422. Children's Hospital failed to supply Infuse/BMP-2 (aka product) in the manner in which it was represented.

423. Children's Hospital failed to provide any warning or instruction in regard to Infuse/BMP-2, and failed to make sure any other party gave such warning or instruction.

424. Plaintiff suffered physical, financial, and emotional harm due to Children's Hospital's violation of the Ohio Products Liability act. Plaintiff's injuries were a foreseeable risk

425. Plaintiff did not alter, modify or change the product, nor did Plaintiff know that the product was being implanted without all required components.

426. Children's Hospital knew or should have known that the product was extremely dangerous and should have exercised care to provide a warning that the product was being used and that the product was being used outside FDA and manufacturer requirements. The harm caused to Plaintiff by not providing an adequate warning was foreseeable,

427. Children's Hospital knew that the product did not conform to the representation of the intended use by the manufacturer yet permitted the product to be implanted into Plaintiff.

428. Children's Hospital, as a supplier, acted in an unconscionable manner in failing to supply the product without all FDA and manufacturer required components.

429. Children's Hospital intentionally billed Infuse/BMP-2 as "Miscellaneous" on their billing statements to prevent discovery of the use of Infuse/BMP-2 by the Plaintiff.

430.    Children's Hospital, as a supplier, acted in an unconscionable manner in failing to warn Plaintiff that the product was being supplied without all FDA and manufacturer required components.

431.    Children's Hospital's actions demonstrate they took advantage of the Plaintiff's inability, due to ignorance of the product, to understand the product being implanted without FDA and manufacturer required components.

432.    Children's Hospital substantially benefited financially by the use of the product as the product allowed for Children's Hospital to charge more for the surgery.

433.    Plaintiff suffered economic loss as defined in R.C. § 2303.71(A)(2) and applicable law.

434.    Plaintiff suffered mental and physical harm due to Children's Hospital's acts and omissions.

435.    Plaintiff suffered emotional distress due to acts and omissions of Children's Hospital and is entitled to recovery as defined in R.C. § 2307.71(A)(7) and applicable law.

436.    Children's Hospital violated the Ohio Products Liability Act R.C. § 2307.71-2307.80

437.    Children's Hospital violated R.C. § 2307.71(A)(6)

438.    Children's Hospital violated The Ohio Consumer Sales Practices Act R.C. § 1345.02-.03.

439.    Children's Hospital provided inadequate warnings are defined in R.C, § 2307.76(A) and applicable law.

## PRAYER FOR RELIEF

    WHEREFORE, Plaintiff requests and seeks justice in the form and procedure of a jury, verdict and judgment against Defendants on all claims for the following damages:

1.      Past medical bills;

2.      Future medical bills;

3.      Lost income and benefits;

4.      Lost future income and benefits;

5.      Loss of ability to earn income;

6.      Past pain and suffering;

7.      Future pain and suffering;

8.      Plaintiff seeks a finding that their injuries are catastrophic under Ohio Rev. Code §2315.18;

9.      Plaintiff seeks all relief available under the Ohio Products Liability Act R.C. § 2307.71-

2307.80 and applicable law;

10.     All incidental costs and expenses incurred as a result of their injuries;

11.     The damages to their credit as a result of their injuries;

12.     Loss of consortium;

13.     Punitive damages;

14.     Costs;

15.     Attorneys' fees;

16.     Interest;

17.     All property loss;

18.     All other relief to which they are entitled including O.R.C. 1345.01

Based upon 1-18 itemization of damages, the damages sought exceed the minimum jurisdictional

amount of this Court and Plaintiff seeks in excess of $25,000.

Respectfully Submitted,

Matthew Hammer (0092483)
Lindsay Boese (0091307)
*Attorneys for Plaintiff*
5247 Madison Pike
Independence, KY 41051
Phone: 513-729-1999
Fax: 513-381-4084
mhammer@ericdeters.com

## **JURY DEMAND**

Plaintiffs make a demand for a jury under all claims.

Matthew Hammer (0092483)
Lindsay Boese (0091307

### CORINNE ZACHRY
### AFFIDAVIT OF MERIT
### WEST CHESTER

I, Keith D. Wilkey, M.D., after being duly sworn and cautioned states as follows:

1. I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or its instruction in an accredited school.  I am an orthopedic surgeon whose focus is on spine surgery and treatment of those with spine issues.

2. I will supplement this affidavit with another, by a letter or by testimony, based upon any information provided to me after I execute it.

3. My curriculum vitae has been previously provided to opposing counsel in these Dr. Durrani cases and can be provided again upon request.  For my review, I rely upon my education, training and experience.

4. I have not counted but I have reviewed, over 50 or more cases involving Dr. Durrani and the hospitals where he once had privileges.

5. I base my opinions in part on my review of all the cases I have reviewed which have revealed similar conduct by Dr. Durrani and the hospitals where he had privileges.

6. I am familiar with applicable standard of care for Ohio, Kentucky and the country for an orthopedic/spine surgeon such as Dr. Durrani.

7. I am also familiar with applicable standard of care, policies, rules and regulations, medical executive committee bylaws, JCAHO requirements, credentialing, supervising, retention of medical staff, granting and rejecting privileges and the peer review process for West Chester Hospital, LLC, also referred to as West Chester Hospital or West Chester Medical Center and UC Health.

8. I have reviewed all relevant medical records including radiology of Dr. Durrani's medical treatment of Corinne Zachry and the medical treatment of Corinne Zachry at West Chester.

9. I have reviewed the Response to Summary Judgment in the Brenda Shell case and all the exhibits attached to it.

10. The Center for Advanced Spine Technologies, Inc. was Dr. Durrani's practice group and he was the sole owner, director and officer of CAST as well as an employee. CAST as such is also responsible for Dr. Durrani's negligence and for their failure to also supervise, discipline and retain Dr. Durrani.

11. I have also reviewed the nursing summary prepared by legal counsel's office for Corinne Zachry.  Based upon the number of cases I've reviewed pertaining to Dr.

1

Durrani, legal counsel's office knows what materials I need to review and provides me those materials. In addition, while this affidavit contains case specific information; it also contains information relevant to this case and/or many and/or most and/or all the other cases. It is prepared for me by counsel with my direction and approval like all of these have been.

12. Based upon my review, the following are the **facts** I rely upon:

A. Surgery plans were not necessary at the time. Based on review of client records and imaging. The client a 14 year old female at the time was referred to Dr. Durrani by Cincinnati Children's Hospital while under treatment for kidney stoned. She had received a call from Children's to schedule an appointment with him due to a problem found with her spine during a CT to evaluate her kidneys. The client and her family were told she had a very serious pars defect that required immediate attention. Parents told if not attended to quickly the clients back would degenerate and client would be lucky to be walking by time she was 30. The client was complaining of low back pain which had been going on for about 1 month. Aside from the fact Dr. Durrani's interpretation of the radiology results were different in severity then the radiologist, Dr. Durrani fails to thoroughly review the client records and any conservative approaches that have tried and failed before moving to more aggressive treatment such as surgery. Dr. Durrani fails to educate the client and her family on the importance of and compliance with physical therapy, reasonable outcomes, pain management and other conservative treatments. The client who at the time was being seen for kidney stones at 14 years of age went from being an active young woman to needing a third surgery to correct the failures from her previous procedures with Dr. Durrani. She has been in constant pain and has had a dramatic change in her functional ability since the first surgery.

B. Dr. Durrani's misinterpretation of the pre-operative diagnostic:
Noted on client visit dated 11/22/2005 Dr. Durrani states. The x-rays were seen today which shows a complete L5 pars break bilateral with grade 1/coming to listhesis. The CT was reviewed which also shows a wide gap in the L5 pars break.

The radiologist review of imaging dated 11/22/2005 states a lucent defect in the pars interarticularis of L5. Mild anterolisthesis of L5 relative to S1.

Also noted on client 2nd visit dated 11/29/2005 Dr. Durrani states The MRI shows that she has spinal stenosis extending from L3 inferiorly with disk bulges at L3-L4 and L4-L5. She also has significant spondylolisthesis at L5-S1 with bilateral

2

pars break which was seen on previous CT scan. Also Dr. Durrani states the MRI showed that the L5-S1 disk is significantly degenerated and narrow.

The radiologist states of the MRI dated 11/29/2005 Moderate spinal stenosis extending from L3 to L4, with discogenic disease at L3-L4. There is no nerve root compression.
Grade 1 spondylolisthesis at L5-S1. Previously noted the pars defects are not visualized.
Also noted a right ovarian cyst.

C.  Surgery was recommended on the first office visit dated 11/22/2005.

D.  The client had two surgeries by Dr. Durrani:
The first surgery dated 01/27/2006 at Cincinnati Children's Hospital.

PROCEDURES: L5-S1 Transforaminal lumbar interbody fusion.

PREOPERATIVE AND POSTOPERATIVE DIAGNOSES:
Spondylolisthesis L5 on S1 with a grade 2 slip.

Second surgery dated 08/17/2012 at West Chester Hospital.

PROCEDURES: Attempted direct lateral interbody fusion, L4-L5.
Failed attempt at doing the direct lateral interbody fusion at L4-L5.
Lumbar hemilaminectomy, left side L4-L5.
Transforaminal lumbar diskectomy, L4-L5.
Transforaminal lumbar interbody fusion using auto and allograft, L4-L5.
Placement of transforaminal lumbar interbody fusion cage, L4-L5 (10 x 22 capstone Medtronic cage).
Posterior spinal fusion, L4-L5 using auto and allograft.
Posterior spinal instrumentation, L4-L5 (6.5 mm x 40 mm Medtronic screws).
Extension of fusion from L4-L5 (60 mm Medtronic rods).
Removal of prior quarter inch legacy L5-S1 screws.

PREOPERATIVE AND POSTOPERATIVE DIAGNOSES:
Degenerative spondylolisthesis, L4-L5.
Degenerative spinal stenosis, L4-L5.
Lumbar foraminal stenosis L4-L5.

3

Lumbar radiculopathy, left side at L4-L5.

Noted on implant record dated 01/27/2006 from Cincinnati Children's Hospital. Infuse bone grft lg x 1. Noted on implant record dated 08/17/2012 from West Chester Hospital. Allograft Puregen med 1.0 ml x 1.

E. The following hardware was implanted:
First surgery dated 01/27/2006.
Infuse bone grft lg x 1.
Mastergraft matrix x 1.
Capstone verte-stack vbs 22 x 10 mm x 1.
Screw 5.5 x 30 mm x 2.
Screw 5.5 x 40 mm x 1.
Screw 5.5 x 45 mm x 1.
Rod 6.35 x 40 x 1.
Rod 6.35 x 50 x 1.

Second surgery dated 08/17/2012.
Allograft puregen med 1.0 ml x 1 Alpha scientific.
Putty bone mtrx alphagraft 2.5 x 1 Alphatec spine.
Canc chips 15 ml x 1 Lifenet.
Spacer capstone peek interbody x 1 Medtronic inc sofamor.
Scr cann ma chh 5.5 leg 6.5 x 40 x 4 Medtronic inc sofamor.
Set screw brkoff hex 5.5 m8 TI x 2 Medtronic inc sofamor.
Rod commercial 5.5 x 6 cm TI x 2 Medtronic inc sofamor.

F. According to the PMA submitted by Medtronic to the FDA, infuse was intended for a single level anterior lumbar interbody fusion single performed with all three components in a specific spinal region. The three components that the infuse device consist of are. A metallic cage (the LT cage). The bone graft substitute which consists of liquid rhBMP-2. And a spongy carrier or scaffold for the protein that resides in the fusion cage. With the exception of two non-spinal uses not relevant here, the FDA has not approved any other use of infuse. Including the procedures listed above. Dr. Durrani used a posterior approach, he did not use the approved LT cage instead opting for PEEK cages. Also noted use in multiple procedures on client, as well as in a non FDA regulated level of the spine. The off label use of BMP without the expressed or written consent and/or knowledge of the client is a violation of standards of care, as well as a violation of the manner in which BMP could be used, in accordance with the FDA.

G. The operative report for the first surgery dated 01/27/2006 was dictated on 01/27/2006 at 4:27p by Dr. Ian K. Brimhall for Dr. Durrani.

H. The operative report for the second surgery dated 08/17/2012 was dictated on 08/20/2012 at 14:49 by Dr. Durrani.

I. The following consist of failed hardware:
Noted on second surgery procedures removal of prior quarter-inch legacy L5-S1 screws.
The client was seen by a Dr. Alexandre Rasouli in Los Angeles at Cedars Sinai who told her 2nd fusion did not fuse. And the first one may not have either. Also noted she has two screws penetrating joints.

J. The client was seen in October 2013 by Dr. Alexandre Rasouli at Cedars Sinai after moving to Los Angeles. The client was told 2nd fusion did not fuse and the first one might not have either. An MRI was done the client was told she should have had an anterior approach, she has two screws penetrating joints. The client was told she would require major surgery which may or may not alleviate pain and problems. She was told needs failed fusion corrected, disk replacement in the level above the failed fusion.
Also noted she is seeing a Dr. Roy Nini Cedars Sinai spine center for pain management.

K. The client states she is in more pain now than prior to her surgeries with Dr. Durrani. She has constant back pain, stiffness in back, leg pain. She states her pain is around an 8 of 10 on a daily basis.

L. The client was 14 years old when she first saw Dr. Durrani. Since then she has experienced pain on a daily basis. Has lost flexibility and has just had to go through a third surgery in June of this year to correct what was done to her by Dr. Durrani and will lose another 6-8 weeks of work.

13. Based upon my review, the following are my **opinions** based upon a reasonable degree of medical certainty pertaining to the deviation in standard of care or negligence, informed consent, battery and fraud claims against Dr. Durrani, CAST, West Chester and UC Health which proximately caused harm to Plaintiff:

A. Need to have additional surgery to repair problems created by Dr. Durrani

B. Implantation of Puregen without informed consent

C. Implantation of BMP-2 without informed consent

5

D. Failed hardware

E. Failure to obtain proper informed consent for surgery

F. Failure to provide adequate and thorough pre-operative and post-operative patient surgical education

G. Failure to properly post-op monitor the patient

H. Failure to properly perform follow up, post-op care

I. Negligent surgical techniques

J. Failure to maintain accurate and complete surgical records and surgical consent forms

K. Failure to disclose important health information to patient

L. Failure to maintain and complete discharge summary

M. Failure to supervise Dr. Durrani

N. Negligent pre-surgical diagnosis

O. Failure to prepare a timely operative report or other medical record

P. Billing for services not completed

Q. Not informing the patient another surgeon will be doing all or part of the surgery

R. Practicing outside Dr. Durrani's scope of training, education, experience, and Board certifications

S. Deviation in standard of care

T. Failure to perform thorough and accurate pre-op nonsurgical evaluation

U. Failure by Dr. Durrani to inform patient of additional/changed procedure and reason

V. Failure by CAST to disclose additional/changed procedure and reason to patient

W. Failure by Dr. Durrani at CAST to properly educate patient regarding diagnosis

X. Prior knowledge of possible complication and not acting properly upon same

Y. Failure to disclose pertinent health information to another health care provider

Z. Fraudulent, negligent and reckless pre-operative work up

AA. Fraudulent, negligent and reckless surgery

BB. Inaccurate, fraudulent, and/or exaggeration of diagnoses

CC. Failure to properly educate patient regarding diagnoses

DD. Failure to attempt non-surgical conservative treatment

EE. Failure to perform thorough and accurate pre-op nonsurgical evaluation

FF. Failure by Dr. Durrani at UC/West Chester Hospital to perform accurate and complete preoperative teaching

GG. Failure by Dr. Durrani at UC/West Chester Hospital to properly educate patient regarding diagnoses

HH. Failure by Dr. Durrani at UC/West Chester Hospital to maintain accurate and/or complete medical records

II. Failure of informed consent by Dr. Durrani at UC/West Chester Hospital

JJ. Failure of UC/West Chester Hospital to insure Dr. Durrani and CAST had obtained proper informed consent

KK. Failure of UC/West Chester Hospital to obtain proper acknowledgement of consent

LL. Failure by Dr. Durrani at UC/West Chester Hospital to disclose pertinent health information

MM. Failure by UC/West Chester Health to disclose additional/changed procedure and reason to patient

NN. Failure by UC/West Chester Health to supervise staff

OO. Failure by UC/West Chester Medical staff to properly document abnormalities and follow up care

7

PP. Non-approved hardware combinations

QQ. Dr. Durrani made false and material misrepresentations of material facts intended to mislead Corinne Zachry and concealed material facts he had a duty to disclose. UC/West Chester Health and CAST concealed material facts they had a duty to disclose. Corinne Zachry was justified in relying on the misrepresentation and did rely proximately causing harm to Corinne Zachry. Dr. Durrani, CAST, and UC/West Chester Health intentionally misled Corinne Zachry. Corinne Zachry had the right to correct information.

14. The testimony, facts and exhibits of Brenda Shell's Response to Motion for Summary Judgment and Exhibits to same are applicable to all the claims against West Chester Medical Center (WCMC) and UC Health for all claims, including negligent retention and credentialing brought by Plaintiff.

15. Based upon my review of the deposition testimony, the JCAHO requirements, the MEC bylaws and all the information provided to me, I am able to adopt the following opinions relating to WCMC and UC Health pertaining to the claims against them. WCMC's and UC Health's actions and inactions detailed in this affidavit proximately caused harm to Plaintiff. WCMC and UC Health are both being referenced when only WCMC is named. I hold the following opinions relative to WCMC and UC Health pertaining to their conduct acting through their administration and MEC. The time period covered is from the time Dr. Durrani sought privileges prior to WCMC opening in May 2009 through May 2013 when he no longer had privileges. In addition to my opinions, I set forth facts I rely upon. This includes all which I referenced that I reviewed. In addition to all of the above, I attest to the following:

## FACTS

1. According to West Chester's first Executive Vice President, Carol King, she did not explore the "rumors" about Dr. Durrani's leaving Children's.

2. According to Carol King, the hospital tracked problem issues yet WCMC have failed to produce the information under peer review protection.

3. According to circulating nurse, Janet Smith, presets were changed in the computer to indicate the procedure Dr. Durrani performed after the procedure.

4. According to Janet Smith, despite no one at West Chester never working with Dr. Durrani before, WCMC never checked him out.

5. According to former University Hospital President (a UC Health hospital), Brian Gibler, hospitals face financial challenges.

6. According to risk manager, David Schwallie, risk management knew Durrani had issues.

7. According to radiologist, Thomas Brown, there were surgeons questioning Durrani's decisions to perform surgery.

8. According to medical staff director, Paula Hawk, a policy called "stop the lying" was implemented the same year and month they kicked out Dr. Durrani. This infers a poor environment of honesty and disclosure before this policy.

9. According to Paula Hawk and as the director of medical staff, money is not supposed to trump patient safety.

10. According to Paula Hawk, she admits peer review is for hospitals to protect each other.

11. According to Paula Hawk, she admits hospitals are interested in volume, something Dr. Durrani provided for WCMC and UC Health.

12. According to Mike Jeffers, the director of finance, they tracked Dr. Durrani's financial numbers.

13. According to Mike Jeffers, he admits Dr. Durrani helped them in their time of need.

14. According to Mike Jeffers, Dr. Durrani was the highest money generator.

15. According to Mike Jeffers, he knew Dr. Durrani had more than one surgical suite assigned at once.

16. According to Mike Jeffers, bonuses were paid to him and others based upon finances.

17. According to Dr. Peter Stern, he knew Dr. Durrani was only "satisfactory," not a world class spine surgeon as West Chester advertised.

18. Dr. Stern doesn't deny admitting UC Health looked the other way on Durrani because of money.

19. According to credentialing manager, Ann Shelly, there was plenty of "public knowledge" about Dr. Durrani to check before credentialing.

20. According to Ann Shelly, West Chester relied on the NPDB they knew was protected by hospitals.

9

21. Dr. Eric Schneeberger, Dr. Durrani's partner, was on the MEC at WCMC.

22. According to Eric Schneeberger, West Chester knew about Durrani scheduling surgeries long into the day and night.

23. According to former nursing manager, Elaine Kunko, WCMC knew about Dr. Durrani not completing records.

24. According to Elaine Kunko, WCMC knew Dr. Durrani would claim surgeries were emergency when they were not.

25. According to Elaine Kunko, WCMC knew there was an issue with Dr. Durrani not being in the room doing surgery on "his" patient.

26. According to Elaine Kunko, even the OR nurses knew WCMC put up with Dr. Durrani for money.

27. According to Elaine Kunko, WCMC tracked Dr. Durrani's financial numbers.

28. According to perioperative director, Lisa Davis, WCMC knew Durrani's office is supposed to get consents so WCMC had an obligation to make sure they did.

29. According to Jill Stegman, the risk manager at West Chester, she knew Durrani had "issues."

30. Jill Stegman confirms Gerry Goodman's complaints.

31. According to Kathy Hays, WCMC knew how Dr. Durrani used BMP-2 and PureGen.

32. Dr. Tim Kremchek, the Chief of the Orthopedic department, failed to do his job under the MEC bylaws as it related to the supervision and review of Dr. Durrani.

33. According to Dr. Tim Kremchek, he knew Dr. Durrani was "sloppy."

34. Kevin Joseph, the CEO of WCMC, claims to know nothing about surgery operations in his hospital.

35. Kevin Joseph, the CEO, claims a hospital must protect patients from unnecessary harm "as much as they can."

36. Kevin Joseph, the CEO, claims WCMC doesn't have oversight of surgeons doing what *Plaintiff claims Durrani was doing. (Despite what his bylaws state.)*

10

37. Kevin Joseph, the CEO, denies the hospital has any responsibility if Dr. Durrani did an unnecessary surgery.

38. Kevin Joseph, the CEO, despite his finance office tracking it, denies any knowledge of BMP-2 use.

39. Kevin Joseph, the CEO, denies knowing about any complaints about Dr. Durrani.

40. Kevin Joseph, the CEO, admits they benefited financially from Dr. Durrani, including his own pay.

41. Mark Tromba, the OR manager, admits BMP-2 use as used by Dr. Durrani.

42. According to Jeff Drapalik, the Senior Leadership team, including Joseph, met weekly and reviewed numbers.

43. According to Jeff Drapalik, the CFO of WCMC knew Dr. Durrani was a high volume money maker.

44. Lesley Gilbertson, a member of the MEC of WCMC, and anesthesiologist working with Durrani, had a concern about how long Durrani kept patients under.

45. According to materials manager, Dennis Robb, WCMC knew the volumes of BMP-2 being used.

46. According to Karen Ghaffari, WCMC knew the chart documentation of Dr. Durrani was not in compliance with their bylaws.

47. Patrick Baker, nursing VP at WCMC admits WCMC tracked the financial performance of Dr. Durrani.

48. According to nurse, Vicki Scott, the administration of WCMC knew from the outset of West Chester all the serious issues pertaining to Dr. Durrani.

49. According to Vicki Scott, West Chester's risk manager began to ignore complaints from Ms. Scott.

50. According to Vicki Scott, staff was scared to speak out.

51. According to Vicki Scott, patients didn't know who did the surgeries—Shanti or Durrani.

52. According to Vicki Scott, records were not accurate who was in the OR at what time.

53. According to Vicki Scott, everyone at WCMC knew it was about money.

54. According to Vicki Scott, WCMC knew about Dr. Durrani's and West Chester's illegal use of PureGen.

55. *According to Vicki Scott, Dr. Durrani was a behavior problem.*

56. According to patient representative, Elizabeth Dean, WCMC tracked Dr. Durrani's volumes from the outset and the CFO loved what he saw.

57. According to Elizabeth Dean, WCMC knew Dr. Durrani had issues at Children's.

58. According to Elizabeth Dean, WCMC knew Dr. Durrani was performing unnecessary procedures by volumes and repeats.

59. According to nurse, Scott Rimer, WCMC knew Dr. Durrani waited until after surgeries to document what procedures were planned.

60. According to Scott Rimer, patients at WCMC had procedures they did not consent to and WCMC knew it.

61. According to Scott Rimer, sterile fields were not protected.

62. According to Scott Rimer, WCMC knew PureGen was being used by Dr. Durrani and allowed it.

63. According to Thomas Blank, PureGen was an alternative to BMP-2, which WCMC turned to based upon insurance denials of BMP-2. In addition, Dr. Durrani operated an unethical POD of Alphatech called Evolution Medical to sell PureGen to West Chester.

64. According to Gerry Goodman, WCMC tracked BMP-2 use by Dr. Durrani; patients did not know who at times performed their surgery Dr. Shanti or Dr. Durrani; electronic records had to be changed after Dr. Durrani's surgery; Dr. Durrani and WCMC never obtained informed consents; Dr. Durrani's volume was a warning sign of overutilization. Gerry Goodman reported all these concerns to WCMC and there was no action. Gerry Goodman was told and concluded that WCMC did not want to do anything about Dr. Durrani because of money rewards.

## ADDITIONAL OPINIONS

65. The Center of Advanced Spine Technologies (CAST) negligently supervised and retained Dr. Durrani, including by allowing Dr. Durrani to perform unnecessary procedures and surgeries; use BMP-2 and/or PureGen without appropriate consent; failing to disclose Dr. Shanti and others involvement in surgery; improper billing; changing the pre-op and post-op records to coincide when the surgery was not the surgery disclosed; and all other conduct detailed in the documents I reviewed.

66. WCMC, UC Health and CAST's motive for their actions and inactions towards Dr. Durrani was financial gain.

67. The MEC, administration and Boards of WCMC and UC Health failed to "govern the affairs of the Medical Staff."

68. The MEC, administration and Boards of WCMC and UC Health failed to enforce their rules upon Dr. Durrani as they were required to do.

69. The MEC, administration and Boards of WCMC and UC Health failed to provide oversight of Dr. Durrani as they were required to do.

70. The MEC, administration and Boards of WCMC and UC Health failed to properly evaluate Dr. Durrani.

71. The Orthopedic and Surgery Departments abdicated their responsibility under the MEC bylaws to review, investigate and supervise Dr. Durrani.

72. The MEC, administration and Boards of WCMC and UC Health failed to properly discipline Dr. Durrani including summary suspensions and revocation.

73. The MEC, administration and Boards of WCMC and UC Health failed to properly discipline under the MEC bylaws as it pertains to Dr. Durrani.

74. The MEC, administration and Boards of WCMC and UC Health ignored the information readily available pertaining to Dr. Durrani before credentialing and granting him privileges.

75. The MEC, administration and Boards of WCMC and UC Health failed to act on Dr. Durrani's disruptive behavior, unprofessional behavior and clinical performance placing Plaintiff at risk.

76. The MEC, administration and Boards of WCMC and UC Health certified and approved the unnecessary procedures of Dr. Durrani on Plaintiff knowing they were unnecessary and knowingly allowing the improper use of BMP-2 and/or PureGen and knowing there was not proper informed consent.

13

77. The MEC, administration and Boards of WCMC and UC Health failed to act on Dr. Durrani's failure in medical record documentation.

78. The MEC, administration and Boards of WCMC and UC Health failed to require Dr. Durrani to follow the rules for off label experimental procedures.

79. The MEC, administration and Boards of WCMC and UC Health allowed Dr. Durrani to use undisclosed and unqualified surgeons to perform his surgeries including Dr. Shanti.

80. The MEC, administration and Boards of WCMC and UC Health allowed Dr. Durrani to do multiple surgeries at once.

81. WCMC and UC Health have refused to provide as privileged the peer review information from WCMC for Dr. Durrani to either me or their own expert. Therefore, we have no knowledge of what action, if any, was taken against him. However, based upon the facts here, it is obvious they failed to take action.

82. Based upon all of the above, it's my opinion that WCMC and UC Health were negligent in their credentialing, supervising, disciplining and retaining Dr. Durrani on staff and allowing him to obtain and keep privileges at WCMC under the standards of Ohio as detailed in the Brenda Shell's Response to Motion for Summary Judgment and this proximately caused harm to Plaintiff.

83. The facts support Corinne Zachry's claim for negligence, battery, lack of consent and fraud.

84. As a result of the negligence and conduct of Dr. Durrani, CAST, West Chester and UC Health, Corinne Zachry suffered damages proximately caused by them, including the following:

    A. Permanent disability
    B. Physical deformity and scars
    C. Past, Current and Future Physical and Mental Pain and Suffering
    D. Lost income past, present and future
    E. Loss of enjoyment of life
    F. Past medical expenses
    G. Future medical expenses approximately in the amount of $50,000 to $250,000 depending on course of treatment
    H. Aggravation of a pre-existing condition
    I. Decreased ability to earn income
    J. 3% increased risk of cancer and fear of cancer if BMP-2 was used.

AFFIANT SAYETH FURTHER NOT

_____
KEITH D. WILKEY, M.D.

NOTARY

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by

Keith D. Wilkey, M.D. on this __10__ day of ~~September~~ *November*, 2014.

*Angela Kay Poinsett*
NOTARY PUBLIC
My Commission Exp.: __07/18/2015__
St. Charles County

State of __Missouri__

ANGELA POINSETT
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Charles County
My Commission Expires: July 18, 2015
Commission Number: 11133613

15



## CORINNE ZACHRY
## AFFIDAVIT OF MERIT
## FOR CHILDREN'S

I, Keith D. Wilkey, M.D., after being duly sworn and cautioned states as follows:

1. I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or its instruction in an accredited school. I am an orthopedic surgeon whose focus is on spine surgery and treatment of those with spine issues.

2. I will supplement this affidavit with another, by a letter or by testimony, based upon any information provided to me after I execute it.

3. My curriculum vitae has been previously provided to opposing counsel in these Dr. Durrani cases and can be provided again upon request. For my review, I rely upon my education, training and experience.

4. I have not counted but I have reviewed, over 50 or more cases involving Dr. Durrani and the hospitals where he once had privileges.

5. I base my opinions in part on my review of all the cases I have reviewed which have revealed similar conduct by Dr. Durrani and the hospitals where he had privileges.

6. I am familiar with applicable standard of care for Ohio, Kentucky and the country for an orthopedic/spine surgeon such as Dr. Durrani.

7. I am also familiar with applicable standard of care, policies, rules and regulations, medical executive committee bylaws, JCAHO requirements, credentialing, supervising, retention of medical staff, granting and rejecting privileges and the peer review process for Cincinnati Children's Hospital.

8. I have reviewed all relevant medical records including radiology of Dr. Durrani's medical treatment of Corinne Zachry and the medical treatment of Corinne Zachry at Children's.

9. The Center for Advanced Spine Technologies, Inc. was Dr. Durrani's practice group and he was the sole owner, director and officer of CAST as well as an employee. CAST as such is also responsible for Dr. Durrani's negligence and for their failure to also supervise, discipline and retain Dr. Durrani.

10. I have also reviewed the nursing summary prepared by legal counsel's office for Corinne Zachry. Based upon the number of cases I've reviewed pertaining to Dr. Durrani, legal counsel's office knows what materials I need to review and provides me those materials. In addition, while this affidavit contains case specific

information; it also contains information relevant to this case and/or many and/or most and/or all the other cases. It is prepared for me by counsel with my direction and approval like all of these have been.

11. Based upon my review, the following are the **facts** I rely upon:

12. Surgery plans were not necessary at the time. Based on review of client records and imaging. The client a 14 year old female at the time was referred to Dr. Durrani by Cincinnati Children's Hospital while under treatment for kidney stoned. She had received a call from Children's to schedule an appointment with him due to a problem found with her spine during a CT to evaluate her kidneys. The client and her family were told she had a very serious pars defect that required immediate attention. Parents told if not attended to quickly the clients back would degenerate and client would be lucky to be walking by time she was 30. The client was complaining of low back pain which had been going on for about 1 month. Aside from the fact Dr. Durrani's interpretation of the radiology results were different in severity then the radiologist, Dr. Durrani fails to thoroughly review the client records and any conservative approaches that have tried and failed before moving to more aggressive treatment such as surgery. Dr. Durrani fails to educate the client and her family on the importance of and compliance with physical therapy, reasonable outcomes, pain management and other conservative treatments. The client who at the time was being seen for kidney stones at 14 years of age went from being an active young woman to needing a third surgery to correct the failures from her previous procedures with Dr. Durrani. She has been in constant pain and has had a dramatic change in her functional ability since the first surgery.

13. Dr. Durrani's misinterpretation of the pre-operative diagnostic:
Noted on client visit dated 11/22/2005 Dr. Durrani states. The x-rays were seen today which shows a complete L5 pars break bilateral with grade 1/coming to listhesis. The CT was reviewed which also shows a wide gap in the L5 pars break.

The radiologist review of imaging dated 11/22/2005 states a lucent defect in the pars interarticularis of L5. Mild anterolisthesis of L5 relative to S1.

Also noted on client 2nd visit dated 11/29/2005 Dr. Durrani states The MRI shows that she has spinal stenosis extending from L3 inferiorly with disk bulges at L3-L4 and L4-L5. She also has significant spondylolisthesis at L5-S1 with bilateral pars break which was seen on previous CT scan. Also Dr. Durrani states the MRI showed that the L5-S1 disk is significantly degenerated and narrow.

The radiologist states of the MRI dated 11/29/2005 Moderate spinal stenosis extending from L3 to L4, with discogenic disease at L3-L4. There is no nerve root compression.

Grade 1 spondylolisthesis at L5-S1. Previously noted the pars defects are not visualized.

Also noted a right ovarian cyst.

14. Surgery was recommended on the first office visit dated 11/22/2005.

15. The client had two surgeries by Dr. Durrani:

    The first surgery dated 01/27/2006 at Cincinnati Children's Hospital.

    PROCEDURES: L5-S1 Transforaminal lumbar interbody fusion.

    PREOPERATIVE AND POSTOPERATIVE DIAGNOSES:
    Spondylolisthesis L5 on S1 with a grade 2 slip.

    Second surgery dated 08/17/2012 at West Chester Hospital.

    PROCEDURES: Attempted direct lateral interbody fusion, L4-L5.
    Failed attempt at doing the direct lateral interbody fusion at L4-L5.
    Lumbar hemilaminectomy, left side L4-L5.
    Transforaminal lumbar diskectomy, L4-L5.
    Transforaminal lumbar interbody fusion using auto and allograft, L4-L5.
    Placement of transforaminal lumbar interbody fusion cage, L4-L5 (10 x 22 capstone Medtronic cage).
    Posterior spinal fusion, L4-L5 using auto and allograft.
    Posterior spinal instrumentation, L4-L5 (6.5 mm x 40 mm screws).
    Medtronic Extension of fusion from L4-L5 (60 mm Medtronic rods).
    Removal of prior quarter inch legacy L5-S1 screws.

    PREOPERATIVE AND POSTOPERATIVE DIAGNOSES:
    Degenerative spondylolisthesis, L4-L5.
    Degenerative spinal stenosis, L4-L5.
    Lumbar foraminal stenosis L4-L5.
    Lumbar radiculopathy, left side at L4-L5.

    Noted on implant record dated 01/27/2006 from Cincinnati Children's Hospital. Infuse bone grft lg x 1. Noted on implant record dated 08/17/2012 from West Chester Hospital. Allograft Puregen med 1.0 ml x 1.

16. The following hardware was implanted:
    First surgery dated 01/27/2006.

Infuse bone grft lg x 1.
Mastergraft matrix x 1.
Capstone verte-stack vbs 22 x 10 mm x 1.
Screw 5.5 x 30 mm x 2.
Screw 5.5 x 40 mm x 1.
Screw 5.5 x 45 mm x 1.
Rod 6.35 x 40 x 1.
Rod 6.35 x 50 x 1.

Second surgery dated 08/17/2012.
Allograft puregen med 1.0 ml x 1 Alpha scientific.
Putty bone mtrx alphagraft 2.5 x 1 Alphatec spine.
Canc chips 15 ml x 1 Lifenet.
Spacer capstone peek interbody x 1 Medtronic inc sofamor.
Scr cann ma chh 5.5 leg 6.5 x 40 x 4 Medtronic inc sofamor.
Set screw brkoff hex 5.5 m8 TI x 2 Medtronic inc sofamor.
Rod commercial 5.5 x 6 cm TI x 2 Medtronic inc sofamor.

17. According to the PMA submitted by Medtronic to the FDA, infuse was intended
    for a single level anterior lumbar interbody fusion single performed with all three
    components in a specific spinal region. The three components that the infuse
    device consist of are. A metallic cage (the LT cage). The bone graft substitute
    which consists of liquid rhBMP-2. And a spongy carrier or scaffold for the protein
    that resides in the fusion cage. With the exception of two non-spinal uses not
    relevant here, the FDA has not approved any other use of infuse. Including the
    procedures listed above. Dr. Durrani used a posterior approach, he did not use the
    approved LT cage instead opting for PEEK cages. Also noted use in multiple
    procedures on client, as well as in a non FDA regulated level of the spine. The off
    label use of BMP without the expressed or written consent and/or knowledge of
    the client is a violation of standards of care, as well as a violation of the manner in
    which BMP could be used, in accordance with the FDA.

18. The operative report for the first surgery dated 01/27/2006 was dictated on
    01/27/2006 at 4:27p by Dr. Ian K. Brimhall for Dr. Durrani.

19. The operative report for the second surgery dated 08/17/2012 was dictated on
    08/20/2012 at 14:49 by Dr. Durrani.

20. The following consist of failed hardware:
    Noted on second surgery procedures removal of prior quarter-inch legacy L5-S1
    screws.
    The client was seen by a Dr. Alexandre Rasouli in Los Angeles at Cedars Sinai
    who told her 2nd fusion did not fuse. And the first one may not have either. Also
    noted she has two screws penetrating joints.

21. The client was seen in October 2013 by Dr. Alexandre Rasouli at Cedars Sinai after moving to Los Angeles. The client was told 2nd fusion did not fuse and the first one might not have either. An MRI was done the client was told she should have had an anterior approach, she has two screws penetrating joints. The client was told she would require major surgery which may or may not alleviate pain and problems. She was told needs failed fusion corrected, disk replacement in the level above the failed fusion.
Also noted she is seeing a Dr. Roy Nini Cedars Sinai spine center for pain management.

22. The client states she is in more pain now than prior to her surgeries with Dr. Durrani. She has constant back pain, stiffness in back, leg pain. She states her pain is around an 8 of 10 on a daily basis.

23. The client was 14 years old when she first saw Dr. Durrani. Since then she has experienced pain on a daily basis. Has lost flexibility and has just had to go through a third surgery in June of this year to correct what was done to her by Dr. Durrani and will lose another 6-8 weeks of work.

24. Based upon my review, the following are my **opinions** based upon a reasonable degree of medical certainty pertaining to the deviation in standard of care or negligence, informed consent, battery and fraud claims against Dr. Durrani and Cincinnati Children's Hospital which proximately caused harm to Plaintiff:

   A. Need to have additional surgery to repair problems created by Dr. Durrani

   B. Implantation of BMP-2 without informed consent

   C. Failed hardware

   D. Failure to obtain proper informed consent for surgery

   E. Failure to provide adequate and thorough pre-operative and post-operative patient surgical education

   F. Failure to properly post-op monitor the patient

   G. Failure to properly perform follow up, post-op care

   H. Negligent surgical techniques

   I. Failure to maintain accurate and complete surgical records and surgical consent forms

5

J.  Failure to disclose important health information to patient

K.  Failure to maintain and complete discharge summary

L.  Failure to supervise Dr. Durrani

M.  Negligent pre-surgical diagnosis

N.  Failure to prepare a timely operative report or other medical record

O.  Billing for services not completed

P.  Not informing the patient another surgeon will be doing all or part of the surgery

Q.  Practicing outside Dr. Durrani's scope of training, education, experience, and Board certifications

R.  Deviation in standard of care

S.  Failure to perform thorough and accurate pre-op nonsurgical evaluation

T.  Failure by Dr. Durrani to inform patient of additional/changed procedure and reason

U.  Failure by CAST to disclose additional/changed procedure and reason to patient

V.  Failure by Dr. Durrani at CAST to properly educate patient regarding diagnosis

W.  Prior knowledge of possible complication and not acting properly upon same

X.  Failure to disclose pertinent health information to another health care provider

Y.  Fraudulent, negligent and reckless pre-operative work up

Z.  Fraudulent, negligent and reckless surgery

AA.  Inaccurate, fraudulent, and/or exaggeration of diagnoses

BB.  Failure to properly educate patient regarding diagnoses

CC.  Failure to attempt non-surgical conservative treatment

DD.  Failure to perform thorough and accurate pre-op nonsurgical evaluation

EE. Failure by Dr. Durrani at CCH to perform accurate and complete preoperative teaching

FF. Failure by Dr. Durrani at CCH to properly educate patient regarding diagnoses

GG. Failure by Dr. Durrani at CCH to maintain accurate and/or complete medical records

HH. Failure of informed consent by Dr. Durrani at CCH

II. Failure of CCH to insure Dr. Durrani and CAST had obtained proper informed consent

JJ. Failure of CCH to obtain proper acknowledgement of consent

KK. Failure by Dr. Durrani at CCH to disclose pertinent health information

LL. Failure by CCH to disclose additional/changed procedure and reason to patient

MM. Failure by CCH to supervise staff

NN. Failure by CCH staff to properly document abnormalities and follow up care

OO. Non-approved hardware combinations

PP. Dr. Durrani made false and material misrepresentations of material facts intended to mislead Corinne Zachry and concealed material facts he had a duty to disclose. CCH and CAST concealed material facts they had a duty to disclose. Corinne Zachry was justified in relying on the misrepresentation and did rely proximately causing harm to Corinne Zachry. Dr. Durrani and CCH intentionally misled Corinne Zachry. Corinne Zachry had the right to correct information.

25. Based upon my review of the deposition testimony, the JCAHO requirements, the MEC bylaws and all the information provided to me, I am able to adopt the following opinions relating to CCH pertaining to the claims against them. CCH's actions and inactions detailed in this affidavit proximately caused harm to Plaintiff. CCH are both being referenced when only CCH is named. I hold the following opinions relative to CCH pertaining to their conduct acting through their administration and MEC. The time period covered is from the time Dr. Durrani joined Children's Hospital until he left by January 1, 2009. In addition

to my opinions, I set forth facts I rely upon. This includes all which I referenced that I reviewed. In addition to all of the above, I attest to the following:

1. CCH's motive for their actions and inactions towards Dr. Durrani was financial gain.

2. The MEC, administration and Boards of CCH failed to "govern the affairs of the Medical Staff."

3. The MEC, administration and Boards of CCH failed to enforce their rules upon Dr. Durrani as they were required to do.

4. The MEC, administration and Boards of CCH failed to provide oversight of Dr. Durrani as they were required to do.

5. The MEC, administration and Boards of CCH failed to properly evaluate Dr. Durrani.

6. The Orthopedic and Surgery Departments abdicated their responsibility under the MEC bylaws to review, investigate and supervise Dr. Durrani.

7. The MEC, administration and Boards of CCH failed to properly discipline Dr. Durrani including summary suspensions and revocation.

8. The MEC, administration and Boards of CCH failed to properly discipline under the MEC bylaws as it pertains to Dr. Durrani.

9. The MEC, administration and Boards of CCH ignored the information readily available pertaining to Dr. Durrani before credentialing and granting him privileges.

10. The MEC, administration and Boards of CCH failed to act on Dr. Durrani's disruptive behavior, unprofessional behavior and clinical performance placing Plaintiff at risk.

11. The MEC, administration and Boards of CCH certified and approved the unnecessary procedures of Dr. Durrani on Plaintiff knowing they were unnecessary and knowingly allowing the improper use of BMP-2 and/or PureGen and knowing there was not proper informed consent.

12. The MEC, administration and Boards of CCH failed to act on Dr. Durrani's failure in medical record documentation.

13. The MEC, administration and Boards of CCH failed to require Dr. Durrani to follow the rules for off label experimental procedures.

14. The MEC, administration and Boards of CCH allowed Dr. Durrani to use undisclosed and unqualified surgeons to perform his surgeries including fellows and interns.

15. The MEC, administration and Boards of CCH allowed Dr. Durrani to do multiple surgeries at once.

16. CCH have refused to provide as privileged the peer review information from CCH for Dr. Durrani to either me or their own expert. Therefore, we have no knowledge of what action, if any, was taken against him. However, based upon the facts here, it is obvious they failed to take action.

17. Based upon all of the above, it's my opinion that CCH were negligent in their credentialing, supervising, disciplining and retaining Dr. Durrani on staff and allowing him to obtain and keep privileges at CCH under the standards of Ohio and this proximately caused harm to Plaintiff.

18. The facts support Corinne Zachry claim for negligence, battery, lack of consent and fraud.

19. As a result of the negligence and conduct of Dr. Durrani and CCH Corinne Zachry suffered damages proximately caused by them, including the following:

   A. Permanent disability
   B. Physical deformity and scars
   C. Past, Current and Future Physical and Mental Pain and Suffering
   D. Lost income past, present and future
   E. Loss of enjoyment of life
   F. Past medical expenses
   G. Future medical expenses approximately in the amount of $50,000 to $250,000 depending on course of treatment
   H. Aggravation of a pre-existing condition
   I. Decreased ability to earn income
   J. 3% increased risk of cancer and fear of cancer if BMP-2 was used.

AFFIANT SAYETH FURTHER NOT

_____
KEITH D. WILKEY, M.D.


NOTARY

9

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by

Keith D. Wilkey, M.D. on this ___10___ day of ~~September~~ *November*, 2014.

_Angela Kay Poinsett_
NOTARY PUBLIC
My Commission Exp.: 04/18/2015
St Charles County

State of _Missouri_

ANGELA POINSETT
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Charles County
My Commission Expires: July 18, 2015
Commission Number: 11133613

10